In re **JUST FOR THE FUN OF IT OF TENNESSEE, INC., Debtor.**

**FIRST NATIONAL BANK OF GATLINBURG, Plaintiff,**

v.

**CHARLES BLALOCK & SONS, INC. et al., Defendants.**

Bankruptcy No. 3–79–00858.
Adv. No. 3–80–0058.

United States Bankruptcy Court, E. D. Tennessee.

Sept. 12, 1980.

John H. Fowler, Knoxville, Tenn., for plaintiff.

Charles Child, Knoxville, Tenn., for defendant Gary Botkin.

Charlie R. Johnson, Sevierville, Tenn., for defendants Charles Blalock and Sons, Blalock Lumber Co., L. B. Foster Co., and McMurry Roofing Co.

David B. Maxwell, Sevierville, Tenn., for defendant Thomas F. Rucker.

Lanning P. Wynn, Sevierville, Tenn., for defendants Ronnie L. Simms, LaFollette Electric Co., Blalock Hardware, Georgia Bresenham d/b/a Green–Bee Nursery, Cash Hardware, and City of Pigeon Forge.

Henry T. Ogle, Knoxville, Tenn., for defendants Valentine Bros. Nursery, Allen Sawmill, and Scott Heating and Air Conditioning Co.

Charles S. Sexton, Sevierville, Tenn., for defendants Earl and Edith LaFollette.

William A. Newcomb, Harriman, Tenn., for defendant McDonald Enterprises.

Frankie E. Wade, and James A. McIntosh, Knoxville, Tenn., for defendants Roden Electrical Supply Co., and Knox–Tenn Rental Co.

Sumter D. Ferguson, Joel H. Anderson, B. J. Reed, Knoxville, Tenn., for defendant Tindells, Inc.

Sharon Bell, Knoxville, Tenn., trustee.

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

### I

In this multi–issue controversy involving a lender, materialmen, lessors and lessees of real property, and the trustee in bankruptcy, the first issue that will be determined is the validity of the materialmen's asserted liens.[1] Prior to such determination, however, certain facts either undisputed by the parties or found by the court applicable to all issues are set forth as follows. Additional findings as necessary and required will be made when specific issues are considered.

(1) On May 30, 1978, Earl and Edith LaFollette leased to McDonald Enterprises, Inc., (McDonald), a 69–acre undeveloped tract in Pigeon Forge, Sevier County, Ten-

---

1. The pretrial order entered June 20, 1980, states the issues as follows:

1. Did the plaintiff advance a sum of money, and if so, how much and to what extent is it secured by deeds of trust on the leasehold estate?

2. Did any other party advance money to the debtor secured by a mortgage on real property, if so, how much?

3. With respect to each defendant claiming a mechanic's lien, did they supply materials and labor to the project, file a notice of lien and subsequent appropriate litigation to perfect their interest so far as a mechanic's lien is considered?

3. [sic] Does the recorded notice of completion comply with the above *Tennessee Code Annotated* § 64–1145 and is otherwise valid.

4. If the notice of completion does comply with the above *Tennessee Code Annotated* section did any claimant properly comply with it?

5. If the notice of completion does not comply with the statute or is otherwise invalid, to what date does each mechanic's lien relate?

6. Did any of the lien claimants waive lien rights so as to make them inferior to one or more of plaintiff's deeds of trust?

7. Does the lease contain language or obligations on the part of these parties thereto which would subject the fee interest in the underlying property insofar as mechanic's liens are involved?

8. What is the order of priority between the various holders of mortgages, mechanic's liens and the trustee in bankruptcy.

nessee.[2] The term of the lease was for 99 years, with an option to renew for an additional period of 20 years. Paragraph (5) of the lease states that it is understood that Lessee contemplates using the property for the "purpose of building thereon an amusement park with additional businesses and entertainment facilities deemed necessary by Lessee to be successful in the operation and promotion of the proposed amusement park". Rent for the initial term was to be installments as follows:

(A) $21,000 per year with the first payment to be made in two installments payable $10,500 on June 1, 1978, and $10,500 on December 1, 1978.

(B) Beginning July 1, 1979, lease payments would increase $1,000 per year for the term of the lease of 99 years.

(2) Construction work on the amusement park commenced in the latter part of March 1979, and continued through the last week of July, or the first week of August, 1979.

(3) On May 3, 1979, McDonald assigned the LaFollette lease to Just For the Fun of It Production, Inc., "a Florida corporation" (Production, Inc.). John A. Wilnau executed the lease as President of Production, Inc. In addition to assuming all obligations under the LaFollette lease, Production, Inc., agreed to pay to McDonald "three percent (3%) of all gross revenue collected by assignee arising out of the use and ownership of said leasehold estate."

(4) On June 8, 1979, Productions, Inc., assigned the LaFollette lease to Just For the Fun of It of Tennessee, Inc., "a Tennessee corporation" (Tennessee, Inc.). John A. Wilnau executed the document as President on behalf of both Production, Inc., and Ten-

nessee, Inc. Production, Inc., assigned its leasehold interest in the LaFollette lease to Tennessee, Inc., and Tennessee, Inc., in addition to assuming all obligations under the LaFollette lease and the assignment by McDonald to Production, Inc., agreed to pay "three percent (3%) of all gross revenues" collected by Tennessee, Inc., arising out of its use and ownership of the leasehold estate.

(5) On June 8, 1979, Tennessee, Inc. executed a deed of trust conveying the leasehold estate in the 69–acre tract to A. Randolph Sykes, Trustee, to secure a note in the amount of $200,000 payable to the First National Bank of Gatlinburg (Bank). This deed of trust was recorded in Sevier County, Tennessee, on June 8, 1979.

(6) On June 8, 1979, Tennessee, Inc. also assigned to the Bank as collateral for the $200,000 note all of its right, title and interest as lessee acquired by it from Production, Inc. This assignment was recorded in Sevier County, Tennessee, on June 8, 1979.

(7) On June 8, 1979, Tennessee, Inc. executed a deed of trust to Sykes as Trustee securing the same $200,000 note referred to in (5) and (6) above. This deed of trust was recorded in Sevier County, Tennessee, on June 18, 1979.

(8) On June 18, 1979, Tennessee, Inc. executed a "Second Deed of Trust" to Sykes as Trustee to secure a $75,000 note payable to the Bank executed by William S. Johnson, George M. Johnson, and W. H. Permenter. This deed of trust was recorded in Sevier County, Tennessee, on June 23, 1979.

(9) On June 22, 1979, a "Notice of Completion" signed and acknowledged by "Gary

---

2. "Pigeon Forge is situated astride U.S. Highway 441 (The Parkway), which is the principal traffic artery from Knoxville into the Great Smoky Mountain National Park and Gatlinburg. It is a progeny of the phenomenal growth and development of the 'fabulous and fascinating resort' city of Gatlinburg. . . .

The growth has been dramatic from a standpoint of commercial activity, virtually all of which is tourist oriented. It has become a smaller Gatlinburg made attractive by enterprising business leaders who have created a tourist mecca in its own right. While its resi-

dent population is small–approximately 1,880– it is saturated with motels, restaurants and places of amusement.

Pigeon Forge is a linear city, approximately three and one–half miles long with commercial developments along either side of Highway 441. Except for two protrusions (Silver Dollar City and Tommy Bartletts), it generally runs back from the highway only a block or so in depth." *State of Tennessee, ex rel. Collier v. City of Pigeon Forge et al.*, 599 S.W.2d 545 (Tenn.1980).

L. Botkin, d/b/a Kingston Development Company, General Contractor", was filed in the office of the Register of Deeds for Sevier County, Tennessee. Location and description of the property is shown as—

"Situate in the Fifth (5th) Civil District of Sevier County, Tennessee in JUST–FOR–THE–FUN–OF–IT PARK, *Phase I*, located on 69.0 acres, more or less, of the Earl LaFollette Property". (Emphasis added.)

"Date of the completion of the structure, improvement or demolition" is shown in the Notice of Completion as June 15, 1979.

(10) On August 5, 1979, Tennessee, Inc. executed a deed of trust to Sykes as Trustee to secure a note to the Bank in the amount of $25,000. This deed of trust was recorded September 5, 1979.

(11) On August 9, 1979, Tennessee, Inc. executed a deed of trust to M. Coppley Vickers as Trustee to secure a note in the amount of $24,000 payable to Thomas F. Rucker. This deed of trust was recorded August 10, 1979.

(12) On August 25, 1979, a "Lis Pendens Notice" was filed in the office of the Register of Deeds for Sevier County, Tennessee, as the result of a lawsuit styled *William Welper v. Just For The Fun Of It Tennessee, Inc.*, Circuit Court for Sevier County, No. 6197.

(13) On September 17, 1979, Charles Blalock & Sons, Inc., and others filed a complaint in the form of a general lienor's bill and/or bill to marshal liens against Tennessee, Inc. and others, in the Chancery Court for Sevier County, Tennessee. A writ of attachment for the subject property was issued on the same date.

(14) On November 13, 1979, Roddy Manufacturing Company recorded a judgment in the office of the Register of Deeds against Tennessee, Inc. in the amount of $479.15.

(15) On November 30, 1979, an involuntary petition in bankruptcy was filed against Tennessee, Inc., and pursuant to 11 U.S.C. 303, an order for relief was entered January 4, 1980.

II

## VALIDITY OF MATERIALMENS' LIENS

Materialmen asserting lien claims under T.C.A. 64–1101, et seq., are—

| CLAIMANT | DATE NOTICE OF LIEN FILED | AMOUNT |
|---|---|---|
| Tindell's, Inc. | August 21, 1979 | $27,659.01 |
| Ronnie L. Sims | August 31, 1979 | $ 1,015.00 |
| LaFollette Electric | August 13, 1979 | $25,456.57 |
| City of Pigeon Forge | September 19, 1979 | $ 5,871.64 |
| Roden Electrical Supply Co. | April 11, 1980 | $ 1,332.88 |
| Knox-Tenn Rental Co. | April 10, 1980 | $ 2,594.42 |
| Gary L. Botkin | August 16, 1979 | $32,808.56 |
| Cash Hardware | August 23, 1979 | $ 450.79 |
| Green Bee Nursery | August 23, 1979 | $ 3,519.62 |

| CLAIMANT | DATE NOTICE OF LIEN FILED | AMOUNT |
|---|---|---|
| Blalock Hardware Co., Inc. | August 23, 1979 | $ 7,498.22 |
| Scott Heating & Air Conditioning Co. | September 11, 1979 | $ 6,018.47 |
| Allen Sawmill Co. | August 31, 1979 | $ 1,350.00 |
| Valentine Bros. Nursery | August 31, 1979 | $ 1,500.00 |
| L. B. Foster Company | November 9, 1979 | $ 1,407.30 |
| Blalock Lumber Co. | August 22, 1979 | $13,238.26 |
| Charles Blalock & Son, Inc. | August 22, 1979 | $19,508.76 |

Another lien claimant, McMurry Roofing Co., did not file a notice of lien in the office of the County Register but filed a proof of claim in the bankruptcy proceeding on May 5, 1980, asserting a lien in the amount of $3,000.00.

Pertinent sections of the Mechanics' and Materialmen's statute of Tennessee, T.C.A. 64–1101 to 64–1158 are set forth, as follows.

T.C.A. 64–1102 gives to furnishers a lien on the property for materials furnished or improvements made by special contract with the owner. " 'Owner' includes ... a lessee for a term of years...." T.C.A. 64–1101. T.C.A. 64–1106 states that the lien shall continue for one year after the work is finished or materials are furnished, and until the final decision of any suit that may be brought within that time for its enforcement. T.C.A. 64–1112 provides that, in order to preserve the lien as to subsequent purchasers or encumbrancers for a valuable consideration without notice thereof, a sworn statement must be filed for record in the office of the register of deeds where the premises are located within ninety days after the building or structure or improvement is demolished and/or altered, as the case may be, or is abandoned and the work not completed, or the contract of the

lienor expires or is terminated or he is discharged. Section 1112 further provides that, prior to that time, the lien shall be effective as against purchasers or encumbrancers, without registration.

Section 544(a) of Title 11 of the United States Code vests the trustee in bankruptcy with the rights of a creditor on a simple contract with a judicial lien on the property of the debtor as of the date of the petition; the rights of a creditor with a writ of execution against the property of the debtor unsatisfied as of the date of the petition; and the rights of a bona fide purchaser of real property of the debtor as of the date of the petition.

Section 545 of the Code enacts that the trustee may avoid the fixing of a statutory lien on property of the debtor to the extent that such lien "(2) is not perfected or enforceable on the date of the filing of a petition against a bona fide purchaser that purchases such property on the date of the filing of a petition, whether or not such purchaser exists".

Section 546 limits the rights and powers of a trustee under section 544 or 545 to any generally applicable law that permits perfection of an interest in property to be effective against an entity that acquires

rights in such property before the date of such perfection. The purpose of this subsection is to protect, in spite of the intervention of a bankruptcy petition, those whom State law protects by allowing them to perfect their liens or interests within the statutory time. Thus, in the factual situation presented in the present controversy, potential lien claimants in order to comply with the ninety–day period would have had to file their notices of lien sometime prior to November 1–5, 1979.[3]

The Bank insists that the Notice of Completion filed June 22, 1979, effectively cuts off the rights of materialmen who did not give notice required by T.C.A. 64–1147.[4] This issue requires a determination of whether Gary Botkin, d/b/a Kingston Development Company, who executed the Notice of Completion, was in reality the "general contractor" as the notice indicates. Although there is no doubt but that many of the materialmen believed that Botkin was the general contractor, and that he, in fact, signed at least three documents to that effect, including the critical Notice of Completion, the preponderance of the evidence conclusively shows that Botkin was *not* the general contractor. In his sworn testimony before this court, he denied that he was the general contractor, and the exhibits filed in support of his lien claim support this denial. See Col. Ex. 22. To the extent, however, that Botkin's representation that he was the general contractor damaged other materialmen or prejudiced the Bank, his recovery will be subordinated.

The documents signed by Botkin as "general contractor" are (1) the Notice of Completion filed in the office of the Register of Deeds on June 22, 1979; (2) an application for credit extension submitted to Roden Electric Company on June 18, 1979; and (3) an unsworn affidavit submitted to the Bank on or about June 8, 1979.

Botkin's explanation of his role in the construction of the amusement project is summarized as follows. In early April, 1979, after meeting with Wilnau, president of Tennessee, Inc., on one or more occasions, he agreed orally to furnish "carpentry work on the exterior of the buildings" that were to be constructed for which he would be reimbursed all moneys paid to others, plus 10%. In addition, he would receive a salary of $600.00 per week, plus $100.00 per week for the use of some equipment. He would be paid and/or reimbursed every two weeks. He commenced work on April 18, 1979, and continued through July 1979. He met each morning with Wilnau who gave him instructions as to that day's work. He contacted suppliers and other contractors. He ordered materials for the project. He paid for gas for equipment used on the project which was included in the invoices he submitted to Wilnau. At all times, however, he acted under the specific daily instructions from Wilnau, Tennessee, Inc.'s president. In the early part of June, when the project was encountering financial difficulties, "Phase I," was conceived, and later incorporated in the Notice of Completion.

The Notice of Completion is invalid for a second reason–the amusement park was not complete on either June 15, 1979, as stated in the Notice of Completion, or on June 22,

---

**3.** The exact date has not been established but is not important since lien claimants, with three exceptions, filed notices of liens in August and September 1979. Two did not file until April 1980, and one never filed.

**4.** "64–1147. Unregistered claimants–Notice–Expiration of rights.–Any person claiming a lien for labor or materials upon the property described in the notice of completion who has not previously registered his contract as provided in § 64–1111 or registered a sworn statement as provided in § 64–1112 or § 64–1117 of this code shall send by registered or certified mail written notice addressed to the person, firm or organization and at the address designated in the notice of completion for receiving notice of claims, stating the amount of his claim and certifying that the claim does not include any amount owed to the claimant on any other job or under other contract. Such written notice shall be timely mailed so as to be received by the addressee not more than ten (10) days after the date of the filing of the notice of completion in the register's office, and if same is not received by the addressee within said time, the lien rights of the claimant shall expire. [Acts 1975, ch. 307, § 3.]"

1979, when the Notice of Completion was recorded. Although it is generally conceded by all parties that the project was not complete, the Bank insists that "Phase I" was complete. The proof clearly indicates, however, (1) that "Phase I" did not exist except for the purpose of the filing of the Notice of Completion, and (2) that the project was never in a state of completion, even though Tennessee, Inc. may have "opened the gates" for a short period of time. In reality, Phase I was a figment of someone's imagination. Phase I was never shown on any plat or even mentioned in either of the title reports furnished to the Bank by the attorney for Tennessee, Inc. Construction work on the project and delivery of materials continued unabated after June 15, 1979, and did not cease until the project was abandoned in late July or early August 1979.

Gary Botkin testified that on June 15th only the "exteriors" of the buildings were complete. Although the Notice states that "Phase I" was complete, there is absolutely nothing in the public record that would give notice that only the exterior of the buildings were to be completed in Phase I. When the Notice was filed, only Gary Botkin, Wilnau, and the Bank had ever heard of Phase I. The testimony indicates that Phase I was not conceived until early June when it was apparently believed that it was necessary to "phase" the project so that a notice of completion could be filed in order to cut off the rights of materialmen and others who were still working on, or delivering material to, the project. Even Gary Botkin, who executed the Notice of Completion as the "general contractor", was not informed of the existence of Phase I until the first week of June. Ronnie Sims, the surveyor, was never informed of the existence of Phase I, hence none of the drawings he made distinguished Phase I from the rest of the project. Eddie LaFollette was in daily contact with Wilnau but he never heard of any intent to phase the project until around June 8. Brent Mills, the Bank president, did not learn of Phase I until late May or early June. At this time Tennessee, Inc. had applied for a loan but final approval had not been given.

The testimony of Gary Botkin and other witnesses conclusively shows that work continued for another month after June 15, 1979. Numerous suppliers or contractors testified that they delivered materials to the project or worked on the project after that date. In fact, Gary Botkin testified there was a "tremendous" amount of work remaining to be done on June 15. Eddie LaFollette, testifying with respect to the claim of LaFollette Electric, stated that he worked on the project as late as July 13. Three other claimants did not cease work on the project until July. Allen Sawmill Company delivered lumber to the site as late as July 6. Charles Blalock & Sons furnished materials as late as July 17. Tindell's, Inc. made its last delivery in early July.

In addition to the work described above, other work was performed after June 15. Scott Heating and Air Conditioning did not complete its work until June 28, and Green Bee Nursery did not finish landscaping until June 22. Both claimants had begun work before June 15. The City of Pigeon Forge, which constructed a water–sewer line to the project, did not begin work until about June 16, and did not complete that work until one week later. This court is unable to conceive how a park constructed for the entertainment of the public can be considered complete when no water or sewer service was provided. About the same time that work was commenced by the City of Pigeon Forge, McMurry Roofing commenced work on a roof for one of the buildings in so–called Phase I. The roof was not complete until June 18.

Considering the above facts, this court can only conclude that the notice of completion signed by Gary Botkin and filed on June 22 was untrue, improper, misleading and has no legal effect. The evidence clearly indicates that work continued unabated rather than slowed after June 15. Indeed, as Coppley Vickers, attorney for Tennessee, Inc., stated in a certificate of title examination signed on June 18:

"There are no mechanics and material-mens liens of record in the Register's Office at this date, however, *construction is in process ...*" (Emphasis added.) Because this court has been shown absolutely no evidence that would indicate any portion of the project was complete, the notice of completion cannot be held to have cut off the rights of lien claimants.

From these findings, it conclusively appears that Botkin was not the "general contractor," nor was the project "completed." Thus, the Notice of Completion filed by him is false, misleading and has no legal effect. It follows that the materialmen involved in the proceeding dealt with the "owner," Tennessee, Inc. even though numerous orders for supplies may have been placed through someone other than Tennessee, Inc.'s president, Wilnau. The Notice of Completion signed by Gary Botkin, dba Kingston Development Company, does not cut off the rights of materialmen who duly filed notices of liens. Their lien rights are effective as of the date of visible commencement of operations, that is, on or about April 1, 1979.[5] T.C.A. 64–1104(A). *Tindell Home Center, Inc. v. Union Peoples Bank*, 543 S.W.2d 843 (Tenn.S.Ct. 1976).

The finding that lien claimants' rights are not cut by the Notice of Completion brings them under the protection of T.C.A. 64–1102 and 64–1106, *unless* their lien rights have been cut off by the 90–day period prescribed by T.C.A. 64–1112, that is, by the rights of a subsequent purchaser or encumbrancer. There is *no* doubt but that the trustee in bankruptcy under 11 U.S.C. 545 is such a purchaser.

■ The finding that materialmen dealt with the "owner", however, negates the requirement of giving "notice" under T.C.A. 64–1115 (the sub–contractor's lien requirement). See *Streuli v. Brooks*, 203 Tenn. 373, 313 S.W.2d 262 (1958); *Walker Supply Co. v. Corinth Community Dev., Inc.,* 509 S.W.2d 514 (Tenn.Ct.App. 1974); *In re House Mart, Inc.,* BK–2–76–319 (E.D.Tenn. 1977) aff'd. Thus, lien claimants who filed notices of lien within one of the 90–day periods prescribed by T.C.A. 64–1117 are entitled to lien status. Those who did not cannot be given that status. As will be seen hereafter the City of Pigeon Forge, although filing a notice of lien within the statutory period, is not within the purview of the statute.

## TINDELL'S LIEN NOTICE

■ The Bank insists that the notice of lien filed by Tindell's on August 21, 1979, does not meet the requirements of T.C.A. 64–1117 and *Pulaski Lumber Company v. Harpeth South, Inc.,* Tenn., 501 S.W.2d 275: (1) the lien notice is not signed by an individual as an authorized officer of the corporation, and (2) the "sworn statement" of account is insufficient.[6] The Bank insists that "a separate *sworn* statement of the amount due be given or included with the lien at the time of registration." The lien notice of Tindell's, Inc. s/Donald R. Smith *insofar as material is set out below.*

State of Tennessee
County of Knox

Before me, the undersigned authority a Notary Public in said State and County duly appointed, commissioned, sworn and action personally appeared Donald R. Smith with whom I am personally acquainted, and who, being first duly sworn, acknowledged himself to be Credit Manager of Tindell's, Inc., within named bargainor, a Corporation and that he as such Credit Manager being authorized so to do, executed the within instrument for the purpose therein contained by the said Tindell's, Inc. signing the name of the said Corporation by himself as such

---

5. The exact date need not be determined as no intervening claim is asserted prior to June 8, 1979.

6. Tindell's also filed an "amended" notice of lien on November 7, 1979, but the amended notice was filed more than 90 days after its last delivery of materials and probably more than 90 days after the project was abandoned. T.C.A. 64–1119 requires amendments to be made within the original time period. Since Tindell's filing on August 21, 1979, is hereafter found to comply with the statute, the amended filing becomes moot.

Credit Manager. Further Donald R. Smith does say that in his capacity of Credit Manager of Tindell's, Inc., that he has made known to himself the conditions Tindell's, Inc., account reflecting the deliveries to the aforesaid location and the amount of $27,653.01 stated above is past due on the said account after allowing all credits to which the said Just For The Fun Of Tennessee Inc. entitled.

WITNESS my hand and official seal this ____21____ day of ____August____, 1979.

Notary Public s/ __Glenda D. Gideon__

My Commission Expires:__My commission expires April 16, 1983__

Thus, the acknowledgment and sworn statement of Tindell's is not separated but included in the same form. The Bank does not object to the form as containing a valid acknowledgment but insists that the words used do not constitute a sworn statement of the amount due.

Although falling far short of an artfully drawn acknowledgment and sworn statement, the court concludes that it does meet the requirements of the statute, taking into consideration the four corners of the recorded instrument–a description of the property, the amount due, the signature of the "duly sworn" lienor, and a valid acknowledgment. *In re Viking Company, Inc.*, D.C., 389 F.Supp. 1230 (1974). The Bank has cited no authority for its position that the "sworn statement" and "acknowledgment" cannot be included in the same statement. In the instant case, Donald R. Smith "personally appeared" before a Notary Public who was "personally acquainted" with him. He was "duly sworn." This appears sufficient.

## CLAIM OF THE CITY OF PIGEON FORGE

■ The City of Pigeon Forge filed a notice of lien for $6,107.17 representing the cost of extending water service to the amusement park. It is contended by other claimants that the labor and materials so expended are not covered by a mechanic's lien statute because the work did not occur on the site of the park.

This court is urged to use the test enunciated by the Tennessee Supreme Court in deciding such matters, i. e., whether the material or labor was necessary in order to complete the project. In *Halley v. Alloway*, 78 Tenn. 523 (1882), a curtain, seats, and stage machinery were held to be necessary to complete the "Grand Old Opera" house in Nashville. In *Steger v. Artic Refrigerating Co.*, 89 Tenn. 453, 14 S.W. 1087 (1891), a lien claimant was successful in asserting a mechanic's lien for work performed in the laying of pipes in the streets to transport "vapor" to the defendant's customers. While the *Steger* case would seem to favor the lien of the City of Pigeon Forge insofar as the work *performed* is concerned, this court concludes that the City is not within the protection of the mechanic's lien statute.

T.C.A. 64–1102 extends the lien to any "contractor", "mechanic", "laborer", "founder", or "machinist",[7] who performs

7. "64–1102. Lien for work and materials.– There shall be a lien upon any lot of ground or tract of land upon which a house or structure has been erected, demolished, altered, or repaired, or for fixtures or machinery furnished or erected, or improvements made, by special contract with the owner or his agent, in favor of the contractor, mechanic, laborer, founder or machinist, who does the work or any part of the work, or furnishes the materials or any part of the materials, or puts thereon any fixtures, machinery, or material, and in favor of all persons who do any portion of the work or furnish any portion of the materials for such building.

There shall also be a lien upon any lot of ground or tract of land in favor of any land surveyor who has, by special contract with the owner or his agent, performed on such lots of ground or tracts of land the practice of land surveying, as defined in § 62–1802. The lien shall secure the agreed contract price therefor or a reasonable price for those services per-

work or furnishes materials. The definition of a contractor, laborer, materialman or furnisher is given in T.C.A. 64–1101.[8] In each definition the word "person" is used. But the statute does not define a "person" for the purposes of the mechanics' lien law. "Person" is defined, however, in T.C.A. 1–3–105(14) to include a corporation, firm, company, or association.

In order to determine whether the City is a "person" within the purview of the statutory scheme, this court has examined the decisions under the mechanics' lien laws to discover whom the statutes were intended to protect, and the rules of construction to be used to determine when the protection of the statute is available.

In construing the mechanics' lien statute, the Tennessee Supreme Court has said that the statute is to be liberally construed in reference to the property to which the lien is to attach. *Nanz v. Cumberland Gap Park Co.*, 103 Tenn. 299, 302, 52 S.W. 999 (1899); *Richardson v. Lanius*, 150 Tenn. 133, 263 S.W. 799 (1924). However, this liberal construction of the statute does not extend to the question of "who" is within the protection of the statute:

> "... while this statute is to be liberally construed in reference to the property to which the lien attaches, only those persons enumerated and embraced in the statute are to be held entitled to the lien, and that no persons are to be included under its provisions unless they make it *clearly* appear that they are so entitled, without a strained construction of the statute." *In re American Lime Co.*, 201 F. 433, 435 (D.Ct.E.D.Tenn.1912) (emphasis added).

Since the statute is in derogation of the common law, the statute must be construed strictly to determine the class of persons entitled to its protection and not to extend that protection to others who are not within the provisions of the statute. *Allen v. Brown*, 14 Tenn.App. 405, 408 (E.D.Ct.App. 1932).

In determining whether the City is a "person" when the words are strictly construed, the decisions indicate otherwise. The Supreme Court has stated that it is the private laborer or supplier who is to be protected by the statute. In 1852 the court referred to an "industrious, meritorious class of the community" that was to be protected by having the benefit of their labor secured by a mechanic's lien. *Barnes v. Thompson*, 32 Tenn. 313, 315 (1852). Similarly, in 1860 the court stated the legislature had intended "to secure and protect the laborer in his wages, and thereby to promote and encourage improvements." *Alley & Bush v. Lanier*, 41 Tenn. 540, 541 (1860). Thus, the statute is intended to provide an adequate remedy to a "person", either natural or artificial, who performs work on property, either in constructing buildings, or in improving existing property, and thereby advance the public welfare by encouraging public improvements. Unlike the private laborer or supplier, a city or county is not without an adequate remedy if not protected by the mechanics' lien law. The governmental body has other alternatives with which to "secure and protect" its interests, specifically the taxing power. The best remedy for the private laborer or materialman is a lien which may be enforced against the property he improves. This court, therefore, cannot extend to the

formed by such land surveyor. [Code 1858, § 1981 (Deriv. Acts 1845–1846, ch. 118, §§ 1, 2); Acts 1859–1860, ch. 114 § 1; Shan., § 3531; mod. Code 1932, § 7914; Acts 1977, ch. 380, § 1.]

**8.** " 'Contractor' means a person other than a materialman or laborer who enters into a contract with the owner of real property for improving it, or who takes over from a contractor as above defined the entire remaining work under such contract.

" 'Laborer' means any person who, under properly authorized contract, of any degree of remoteness, personally performs on the site of the improvement labor for improving real property.

" 'Materialmen' or 'furnisher' means any person who, under contract, furnishes material to the owner, contractor, or subcontractor of any degree, on the site of the improvement or for direct delivery to the site of the improvement, or who specially fabricates materials for the improvement, and who performs no labor in the installation thereof." T.C.A. 64–1101.

City the benefit of a statute that the legislature did not *clearly* intend to be available to governmental bodies. If the legislature wishes to make the statute available to governmental bodies, the statute can be amended to so provide.

## LIEN CLAIMANTS

From the testimony and exhibits filed, the court finds that claimants entitled to lien status are—

Tindell's
Ronnie L. Sims
LaFollette Electric
Gary Botkin
Cash Hardware
Green Bee Nursery
Blalock Hardware
Scott Heating & Air Conditioning
Allen Sawmill
Valentine Bros. Nursery
L. B. Foster Company
Blalock Lumber Company
Charles Blalock & Sons, Inc.

Those failing to file notices of lien within the statutory period are—

Roden Electric Supply Co.
Knox–Tenn Rental Co.
McMurry Roofing Co.

and their lien rights, regardless of the reason they failed to perfect their liens, have been effectively cut off by the intervening rights of the trustee in bankruptcy. T.C.A. 64–1112; 11 U.S.C. § 544(a), § 545.[9]

### III

### *Reversionary Interest*

Tindell's, Inc., asserts that the lien claims are enforceable not only against the lessee's Tennessee, Inc., leasehold interest but also against the reversionary interest of the lessors, Earl and Edith LaFollette. This court is urged to make such a finding for two reasons.

First, Tindell's, Inc., alleges that Tennessee, Inc., was the agent of the LaFollettes for the purpose of improving the property and operating an amusement park. The Tennessee courts have held, however, that before an agency relationship can be found

the lease must require a specific use of the land. Further, the distinction is drawn between cases in which the lessor permits or consents to an improvement and the cases in which specific improvement is required. In the former situation the reversionary interest does not attach while in the latter it does attach. *Knox–Tenn Rental Company v. Sarbec Corporation*, 59 Tenn.App. 564, 442 S.W.2d 652 (E.D.Ct.App.Tenn.1968).

The Tennessee Court of Appeals in *Kalthoff, Inc. v. Southside Leasing Company, Inc.*, 477 S.W.2d 15 (Ct.App.E.D.Tenn.1972), held that the lien did not attach to the reversionary interest. In that case, the property in question was to be used as a restaurant or for any other purpose with the consent of the owner. Id. at 16. Because improvements were only permissive and not mandatory, the lessor's interest was not reached.

An opposite result was reached by the Court of Appeals in *Knox–Tenn Rental v. Sarbec Corporation*, 591 Tenn.App. 564, 442 S.W.2d 652 (E.D.Ct.App.1968). Aside from the fact that the lease required the lessee to operate a country club on the property, the court considered several other factors. The lease required rent of 50 percent of the initiation fees and dues paid to the club, but, in consideration of the improvements to be made to the property, the rent during the first year of operation was to be only 25 percent. In addition, the lessor was to receive 10 percent of food sales. Further, the lessee agreed to expend a certain amount, $75,000, in the first year in order to remodel and improve. While making the improvements, no contract was to be signed until it had been approved by the lessor. The lessee was also required to take certain actions to protect the lessor. The lessor was to be insured against liability arising from the operation of the club. The lessor was also to be protected from liens filed against the property; all materialmen were to be put on notice that liens would attach only to the leasehold interest and not to the reversionary interest. The court found from the evidence presented that the lessors knew

that the lessee had a history of beginning such projects and then defaulting. The lessors were aware of the lessee's financial "irresponsibility". Id. at 657. When all facts were considered, the court determined that the liens should attach to the freehold. To hold otherwise the court said "would defeat the policy of the statute designed to protect third parties who become furnishers of labor and materials which inure to the benefit of the freehold". Id. at 657.

The lease in the present case does not require that the land be used for an amusement park, rather "it is understood that lessee *contemplates* using said property for the purpose of building thereon an amusement park . . ." (emphasis added). Therefore, the property could have been used for any other purpose and the lessor would have had no recourse because the lease does not require approval for another purpose.

The rent in the present lease is, like the rent in *Sarbec*, lower for the first year, the time of construction. However, while *Sarbec* lowered the first year's rent from 50 percent to 25 percent of dues, the rent due the LaFollettes increases by $1,000 after the first year and every year thereafter. There are also other similarities between the *Sarbec* and the LaFollette lease. In both leases the lessor is to be insured against loss, and liens of mechanics and materialmen are not to attach to the lessor's interest. When all factors are considered, however, this court concludes the present case is distinguishable from *Sarbec*. In the latter case the lessor retained control over the type of business that was to be carried on, the type of buildings that were to be constructed, and the type of bookkeeping methods to be used. In addition, the lessor was to receive virtually 50 percent of the income. In contrast, the LaFollettes retained *no* control over the type of business conducted, the operation of the business, the type of buildings constructed,

or the bookkeeping methods. Thus, no agency relationship can be found so as to allow the lienors and encumbrancers to reach the reversionary interest on that basis.

Second, Tindell's, Inc., asserts that, whether or not the LaFolletes were required to make improvements so as to create an agency relationship, they failed to file a sworn pleading or answer denying the existence of a joint venture. T.C.A. 24–511.[10] Because of this lack of a denial, Tindell's claims that no proof of a joint venture needs to be put forward. Regardless of whether T.C.A. 24–511 applies to joint ventures, as well as partnerships, this court is unable to conclude that the statute is applicable to the facts of the present case.

The statute refers to the situation in which "two (2) or more persons are *sued* as partners." (Emphasis added). In the complaint filed by the Bank the LaFollettes were made defendants, but there was no allegation of a joint venture. The issue of a joint venture was not raised until an answer was filed by Tindell's, Inc.[11] Therefore, because a joint venture between the LaFollettes and Tennessee, Inc. was not alleged in either the complaint or a cross–complaint, this court is unable to conclude that the LaFollettes were "sued" as partners of Tennessee, Inc. T.C.A. 24–511 is inapplicable, so it is still necessary for Tindell's, Inc. to produce evidence of a partnership or a joint venture. Because they have failed to do so, the lienors and encumbrancers may assert their rights only against the leasehold interest.

IV

CONSTITUTIONALITY OF T.C.A. 64–1147 AND EFFECT OF LIEN WAIVERS

Knox–Tenn Rental Company seeks to have this court hold T.C.A. 64–1147 un-

10. "Where two (2) or more persons are sued as partners, in law or equity, it shall not be necessary to prove the partnership unless the fact of partnership is denied under oath of those so sued." T.C.A. 24–511.

11. The relevant portion of Tindell's answer is as follows:

"Tindell's, Inc. avers that the owners and lessees of the described property participated in and were members of a joint venture for the purpose of the construction and the operation of an amusement park. . . ."

constitutional as a denial of due process of law. According to Knox–Tenn Rental, the statute places an undue burden on lien claimants because it necessarily requires frequent title searches so that notice to the person designated in the notice of completion may be sent within a ten–day period.

Because the Notice of Completion filed by Gary Botkin has been found invalid, the constitutionality of T.C.A. 64–1147 in this case becomes moot. The validity of the various liens as against the owner is established by T.C.A. 64–1102. The validity as against a subsequent purchaser, i. e., the trustee in bankruptcy, is determined by T.C.A. 64–1112 and 11 U.S.C. 544(a) and 545.

As heretofore stated, in order to preserve the lien as against the trustee or a subsequent encumbrancer for valuable consideration, T.C.A. 64–1112 requires the contractor to file a notice of lien in the office of the register of deeds within 90 days after the contract of the lienor expires or is terminated, or the project is completed or abandoned. The amusement park project was abandoned in either late July or early August. Thus, notices of lien should have been filed not later than the first week of November. Two of the lien claimants did not file within that time, and one never filed, hence their priority is lost to the trustee or a subsequent encumbrancer for value. McMurry Roofing Co. never filed a notice of lien. Roden Electric Company and Knox–Tenn Rental filed on April 11 and 10, 1980, respectively, not within the required statutory period.

Four lien claimants–Cash Hardware, La-Follette Electric, Blalock Hardware and Gary Botkin–executed "lien waivers". The Bank therefore insists that they have waived their lien status. While these parties did execute lien waivers, the specific language of the waivers limits their effect. The waivers were executed on identical forms and apply only to money "due or to become due from the owner, on account of

labor or services, material, fixtures or apparatus *heretofore furnished (to this date)"*. (Emphasis added.) The waivers, therefore, apply only to work performed *before* the execution of the waivers. Gary Botkin signed a lien waiver on June 7, 1979; Blalock Hardware signed a waiver on June 8, 1979; Cash Hardware Co. signed on June 8, 1979, and Eddie LaFollette signed on June 8, 1979. The notice of lien filed by each of these parties and the proof before this court indicate claimants are asserting liens only for work performed *after* the date on which the waivers were signed, thus the waivers have no adverse effect. The waivers are not "general" waivers as insisted by the Bank.

V

## THE BANK'S LIENS

The Bank holds three trust deeds on Tennessee, Inc.'s interest in the leasehold property. The first trust deed, securing a note for $200,000, was recorded on June 8, 1979. The second trust deed, securing a note for $75,000, was recorded on June 23, 1979. The third trust deed, securing a note for $25,000, was recorded on September 5, 1979.

The execution of two of the notes listed above was authorized by the board of directors of Tennessee, Inc. The note for $75,000 was not authorized. No evidence has been presented which indicates that Tennessee, Inc. ever received any of the proceeds of this note. The note was not signed by anyone connected with Tennessee, Inc., but was signed by William S. Johnson, George M. Johnson, and W. H. Permenter. The proceeds were not deposited in the account of Tennessee, Inc., rather the evidence shows that the $75,000 was deposited by the Bank in the account of Coin Connection, Inc.[12]

This court can only conclude the $75,000 debt is not an enforceable corporate obligation. For this reason, the trust deed securing the note is not a valid security.

12. The record does not disclose the identity of these persons nor their relationship, if any, to Tennessee, Inc.

The Bank also has advanced funds to keep the lease payments current and to maintain insurance on the property. To that extent the Bank will be reimbursed by the trustee for any funds so advanced as an expense of administration, 11 U.S.C. § 503(b), § 507(a)(1).

## VI

### THOMAS F. RUCKER

■ Thomas F. Rucker is the beneficiary under a deed of trust executed on August 9, 1979, and recorded August 10, 1979, to secure payment of a promissory note in the sum of $24,000. Rucker erected an amphitheatre known as Music Mountain on a portion of the land covered by the LaFollette lease, but some distance away from the principal buildings of the amusement park complex. Construction commenced on April 30, 1979, and was completed May 28, 1979. Rucker insists that he is entitled "to a priority over not only lien claimants but also First National Bank of Gatlinburg to the extent of any loans advanced to Just for the Fun of It of Tennessee, Inc." except monies advanced by the Bank to maintain the leasehold interest in a current status.

Rucker argues that this court should hold and find that an equitable lien under Tennessee case law has arisen as to the property on which and surrounding which he erected the building. Rucker further insists that his improvements were made upon a separate part of the leasehold property, separate and apart from the main amusement complex out of which the main part of this litigation arises as to the priority issues.

Rucker's claim to an equitable lien must be denied. When he was not paid for the building he constructed, he, of course, had the same remedies available to other lien claimants under T.C.A. 64–1101 et seq. Instead he elected to secure his indebtedness by taking a deed of trust on the leasehold property. It will be noted that Rucker not only secured his debt by a lien on the property upon which he constructed the amphitheatre but also upon the leasehold interest in the entire 69–acre tract. He cannot now say that his contract should be excluded from general legal principles applicable in priority issues between materialmen and mortgage holders. The testimony of the Bank official adds nothing to Rucker's assertion of an equitable lien. The cases relied upon by claimant, *Shipley v. Metropolitan Life Insurance Co.*, 158 S.W.2d 739, 25 Tenn.App. 452 (1942); *Podesta v. Podesta*, 189 S.W.2d 413, 28 Tenn.App. 282 (1945), are inapposite.

## VII

### SUBORDINATION

■ The notice of completion filed by Gary Botkin, d/b/a Kingston Development Co., materially injured the Bank and two potential materialmen, Roden Electric Supply Co. and Knox–Tenn Rental Co., and to the extent that his action in filing the false, misleading and invalid notice of completion injured these entities, his lien rights will be subordinated to their rights.

1. Botkin furnished to the Bank on or about June 8, 1979, an unsworn "Affidavit" to the effect that he was the "general contractor" of the project. The bank, relying upon the affidavit and the notice of completion filed by Botkin, on June 8, 1979, advanced $200,000 to the debtor, and on August 5, 1979, (the deed of trust was not recorded until September 5, 1979) advanced an additional $25,000, such advances being secured by valid deeds of trusts.

2. The attorney for Roden Electric Supply Co. and Knox–Tenn Rental Co., upon examining the records in the office of the register of deeds for Sevier County, Tennessee, discovered that a notice of completion had been filed by Botkin as the "general contractor". Relying upon the validity of the notice of completion, and realizing that the ten–day period had expired for giving notice, the attorney determined that the filing of a notice of lien at that time would be a futile gesture.

■ Equitable subordination is an extraordinary remedy. "It's purpose is to undo or offset any inequity in the claim position of a creditor that will produce in-

justice or unfairness to other creditors in terms of the bankruptcy results. *In re Kansas City Journal–Post Co.*, 144 F.2d 791, 800 (8th Circuit 1944)"; *Matter of W. T. Grant Co.*, 4 B.R. 53, 74 (Bkrtcy.N.Y.1980). Before a creditor's claim may be disallowed or its status lowered, it must appear that the creditor has been guilty of some breach of duty or misrepresentation whereby other creditors were deceived to their damage. The standard of misconduct is very substantial. *In re Bowman Hardware and Electric Co.*, 67 F.2d 792, 794 (7th Cir. 1933). There can be little doubt in the instant case, however, that Botkins' conduct in filing the notice of completion as general contractor and later repudiating the assertion materially damaged the Bank, Roden Electrical Company, and Knox–Tenn Rental Co. Equitable subordination is an appropriate remedy.

### VIII

### *Priority*

Funds realized by the trustee from assignment of the lease pursuant to 11 U.S.C. 365 will be disbursed in the following order of priority:

1. Expense of administration, 11 U.S.C. § 507(a)(1);
2. Curing of defaults under the lease. This will include repayment to the Bank of any funds it has advanced or has paid in order to keep the lease current;
3. Materialmen's ' liens as heretofore found to be valid against the trustee in bankruptcy, including the lien of Gary Botkin dba Kingston Development in the amount of $32,808.56, his lien subordinated, however

    a. to the trust deeds of the Bank in the amounts of $200,000 and $25,000, plus interest and attorney fee; and

    b. to the claims of Roden Electrical Supply Co. and Knox–Tenn Rental Co.;

5. The trust deed of the Bank recorded June 8, 1979, in the amount of $200,-000, plus interest, attorney fees, and insurance premiums paid;

6. The trust deed of Thomas F. Rucker recorded August 10, 1979, in the amount of $24,000, plus interest and attorney fees;

7. The trust deed of the Bank recorded September 5, 1979, in the amount of $25,000, plus interest and attorney fees; and

8. Expenses and claims entitled to priority pursuant to 11 U.S.C. § 507(a).

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 752.