42 B.R. 988 (1984)
In re Frank S. OSBORNE and Doris Arlene Osborne, Debtors.
BANK OF NEW RICHMOND, New Richmond Farmer's Union Co-Op Oil Company and General Feeds, Inc., Plaintiffs,
v.
PRODUCTION CREDIT ASSOCIATION OF RIVER FALLS, WISCONSIN, Defendant.
No. 84-C-43-C.
United States District Court, W.D. Wisconsin.
September 18, 1984.
*989 Peter F. Herrell, Jordan, Herrell, & Thiel, Eau Claire, Wis., for plaintiffs.
Keith Rodli, Rodli, Beskar & Boles, S.C., River Falls, Wis., for defendant.

OPINION AND ORDER
CRABB, Chief Judge.
This case involves an application by plaintiffs for equitable subordination under 11 U.S.C. § 510(c) of the claim of defendant Production Credit Association of River Falls, Wisconsin. Plaintiffs claim that defendant's alleged control over the debtors' beef cattle business and misrepresentations to plaintiffs about the degree of support defendant would provide to the debtors entitle plaintiffs to have defendant's claim subordinated to theirs. Defendant appeals *990 the bankruptcy judge's finding that defendant engaged in inequitable conduct which resulted in injury to the plaintiffs and his order that defendant's claim is subordinated to those of the plaintiffs.

Facts
Following a trial on the merits of plaintiffs' claims, the bankruptcy judge made the following findings of fact.
1. That the debtors, Frank S. Osborne and Doris Arlene Osborne, filed an application for relief under Chapter 7 of the Bankruptcy Code on January 15, 1982.
2. That, at all times pertinent to this matter, the debtors were involved in the beef cattle raising business.
3. That the creditors listed by the debtors included: Production Credit Association of River Falls (PCA), Bank of New Richmond (Bank), New Richmond Farmers Union Co-op Oil Company (Cenex) (for feed grinding, feed drying, gas and repairs) and General Feeds, Inc. (General) (for feed potatoes).
4. That the PCA debt was secured by collateral that included, at least, 90% of the debtors' livestock. Exhibits 5 & 6.
5. That PCA and the debtors had a business relationship dating back to, at least, 1976 or early 1977. Tr. at 39 & 104.
6. That in late 1976 or early 1977, James Munson, then representing PCA, told Cenex General Manager Larry Wiesenbeck that he would see to it that the debtors' accounts were paid on a regular basis. Tr. at 105. See also Tr. at 48 & 114.
7. That thereafter, from time to time, Mr. Wiesenbeck would talk with both debtor Frank Osborne (Osborne) and PCA about Osborne's accounts and payment would be forthcoming. Tr. at 107. Occasionally, PCA would make direct payments to Cenex on Osborne's behalf. Tr. at 49 & 153.
8. That, in January 1981, Osborne began to experience continuing overdrafts at the Bank. Tr. at 30.
9. That James Munson, then of the Bank, and a representative of PCA discussed the overdraft problem. Tr. at 12, 30 & 132.
10. That, on March 3, 1981, the Bank set up a "checking reserve agreement" on Osborne's account. Tr. at 29.
11. That, in March or April, 1981, Osborne had to go to PCA on a regular basis for operating loans, tr. at 54, and PCA was aware that there was "weakness" in the Osborne loan. Tr. at 121 & 150.
12. That in April or May, 1981, PCA agreed to cover the Osborne reserve account at the Bank. Tr. at 134.
13. That, in May, 1981, PCA renewed and increased the debtors' loan. Ex. 5.
14. That, in July and August, 1981, PCA made direct payments to General on Osborne's behalf. Ex. 10.
15. That, on August 19, 1981, PCA renewed and increased the debtors' loanbut as a "controlled" loan, ex. 6 & 7, because of concerns about the weakness of the Osborne loan, tr. at 151. A controlled loan is a loan limited to specified items. Tr. at 125.
16. That, on more than one occasion in August or September, 1981, Robert Accola of PCA met with the debtors regarding their financial situation. Tr. at 123.
17. That, during at least one of these meetings, Mr. Accola gave the debtors directions on how the funds from the PCA loan were to be spent. Tr. at 123.
18. That, at one of these meetings, Mr. Accola called Jim Munson of the Bank and asked him to "go along" with the debtors. Tr. at 15, 21, 32, 44, 68 & 124.
19. That, on September 2, 1981, the Bank went along with the debtors, i.e., took a note for $5,000. Tr. at 25.
20. That, on September 9, 1981, PCA representatives met with General representatives. Tr. at 79, 92, 140 & 142. General had initiated the meeting because of its concern regarding the Osborne account. Tr. at 86.
21. That PCA and General met again on October 19, 1981. Tr. 93, 139, 144.
*991 22. That PCA expected General to seek a PCA payment on Osborne's account at the October meeting and prepared a response. Tr. at 140, 142, 146.
23. That the planned and actual PCA response was that payment would depend upon an accurate measurement of the performance of the debtors' cattle. Tr. 94, 140, 146.
24. That General, on more than one occasion after the October meeting, called PCA regarding the Osborne account and was told that payment would be forthcoming as soon as the debtors signed some papers. Tr. at 95.
25. That, on November 6, 1981, PCA representatives went to the Bank to deliver a check for $3,500 to the Bank on Osborne's behalf and to discuss PCA's obligations regarding Osborne's debts. Tr. at 16-20 & 152.
26. That, on that same day, PCA representatives went to Cenex to tell Mr. Wiesenbeck that PCA could provide no more funds for Osborne's account than $1,000. Tr. at 153. See also Ex. 18.
27. That, on November 20, 1981, in response to a threat to stop delivery of feed to Osborne made to PCA by General, PCA agreed to forward a check to General on Osborne's behalf. Tr. at 88 & 96. See Ex. 11. And that such a check was issued on November 30, 1981. Ex. 10.
28. That, in late December, 1981, PCA took possession of, and sold, the debtors' herd. Tr. at 121.
29. That, at least until November of 1981, the applicants looked to PCA for payment of Osborne's accounts. Tr. at 26 & 42-43 (Bank); findings of fact 6 & 7 (Cenex); and findings of fact 20-24 (General).
30. That PCA induced the applicants, by silence or otherwise, see, e.g., tr. at 109, to continue to extend credit to the debtors after it became aware of the debtors' troubled financial situation. See findings of fact 11 & 29.
31. That, given the transactions and relationships between the applicants, the debtors and PCA, PCA had actual or constructive knowledge that Cenex and General would feel compelled to continue to extend credit to the debtors' livestock operation after October and November of 1981 (the Bank did not extend credit after that time, tr. at 36). See Tr. at 109-110 (Cenex) & 89 (General).
32. That the applicants argue for equitable subordination under 11 U.S.C. § 510(c) (1982).
33. That subordination is an appropriate remedy when the court is satisfied that the following conditions are met:
(1) The claimant must have engaged in some type of inequitable conduct;
(2) The misconduct must have resulted in injury to other creditors or conferred an unfair advantage on the claimant;
(3) The subordination must not be inconsistent with the Bankruptcy Code.
In re All Products Co., 32 B.R. 811 (Bankr. E.D.Mich.1983) (applying In re Mobile Steel Co., 563 F.2d 692, 700 (5th Cir.1977) to the Bankruptcy Code).
34. That PCA argues that, as the applicants have not shown that it was an insider in breach of fiduciary duty or that it was a non-insider guilty of gross misconduct, the applicants have not shown that it had engaged in inequitable conduct. See In re Teltronics Services, Inc., 29 B.R. 139, 169 (Bankr.E.D.N.Y.1983).
35. That "the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." Pepper v. Litton, 308 U.S. 295, 308, 60 S.Ct. 238, 246, 84 L.Ed. 281 (1939).
36. That the transactions between the debtors and PCA demonstrated more than an arms-length debtor-creditor relationship. And that these transactions, given the nature of PCA's collateral (livestock that required daily care to preserve value), approach the status of a joint venture.
37. That the transactions between the applicants and PCA demonstrated more than arms-length unsecured creditor-secured creditor relationships. And that these transactions put PCA in a position *992 approachingif not actually reaching that of a guarantor.
38. That PCA's October and November, 1981, attempts to extricate itself from any obligation to the applicants do not shield it from responsibility. Cf. 57 Am.Jur.2d Negligence sec. 46 (1971) (one who renders aid may have a duty to continue to assist) and 57 Am.Jur.2d Negligence sec. 227 (1971) (One whose conduct leads to rescue by another may be liable to the rescuer).
39. That PCA's October and November, 1981, attempts to extricate itself from any obligation to the applicants do not shield it from subordination. Cf. Wis.Stats. sec. 409, 504(1)(a) (reimbursement of cost of holding secured property has priority in distribution of proceeds of sale).
40. That, while PCA may be neither an insider in breach of fiduciary duty nor a non-insider guilty of gross misconduct, it is certainly something in between and has engaged in inequitable conduct.
41. That PCA's inequitable conduct resulted in injury to other creditors, i.e., unpaid debts of the debtors.
42. That PCA's inequitable conduct resulted in an unfair advantage to itself, i.e., preservation of its collateral at the expense of other creditors.
43. That, given this enactment of sec. 510(c), equitable subordination is consistent with the Bankruptcy Code.
In addition to the findings of facts articulated by the bankruptcy court, I find, from the parties' testimony and the entire record, that there is no dispute as to the following additional facts. See Matter of Neis, 723 F.2d 584, 589 (7th Cir.1983).
Testifying on behalf of the Bank, James Munson admitted that he received no guarantees from defendant. Transcript at 31-32. Munson also admitted that the Bank was aware of and concerned about the Osbornes' overdraft problems as early as January 1981. Transcript at 30. Cenex General Manager Wiesenbeck admitted that PCA made no "open end commitments" to him. Transcript at 114-15.

OPINION
Equitable subordination under 11 U.S.C. § 510(c) is an exception to the usual principles of equality of distribution and preference for secured creditors. 11 U.S.C. § 510(c) gives bankruptcy courts broad equitable powers to adjust the status of claims on equitable grounds. However, both prior to and after the adoption of 11 U.S.C. § 510(c) equitable subordination has required that at a minimum the party whose claim is to be subordinated must have engaged in some type of inequitable conduct, and that the misconduct must have resulted in injury to other creditors or an unfair advantage to the claimant. Matter of Mobile Steel Co., 563 F.2d 692, 678-700 (5th Cir.1977); Matter of Multiponics, 622 F.2d 709 (5th Cir.1980). Defendant contends that the bankruptcy judge misapplied the law in concluding that that standard had been satisfied. Before I can reach the merits of that contention, I must deal with issues raised by defendant concerning the appropriate standard of review and the validity of the factual findings made by the bankruptcy judge.
Initially, defendant challenges the applicability of the clearly erroneous standard of review reinstated by Bankruptcy Rule 8013. Defendant argues that application of the clearly erroneous standard to its appeal would conflict with the rationale of Northern Pipeline Construction Co. v. Marathon Pipeline Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) and that in promulgating Bankruptcy Rule 8013, the Court exceeded the authority granted to it under 28 U.S.C. § 2075. Defendant argues that the district court should continue to follow the de novo review procedure mandated by the Emergency Rule enacted in this district after the Northern Pipeline decision. See Moody v. Martin, 27 B.R. 991 (W.D.Wis.1983).
After these arguments were made, Congress enacted the Bankruptcy Amendments and Federal Judgeship Act of 1984, Public Law 98-353. Section 104(a) of the Act amends Title 28 of the United States Code by adding a new chapter 6, including *993 provisions dealing with bankruptcy procedures and appeals. 28 U.S.C. § 157 now enumerates a number of "core proceedings" and provides for de novo review only for proceedings which are not "core proceedings." 28 U.S.C. § 157(c)(1). 28 U.S.C. § 158 also provides that appeals from decisions of bankruptcy judges "shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts. . . ." 28 U.S.C. § 158(c). Since Rule 52(a), Federal Rules of Civil Procedure, applies the clearly erroneous standard to appeals taken from district courts to courts of appeals, the clear implication of both § 158(c) and the special de novo review procedure of § 157(c)(1) is that Congress intended that the clearly erroneous standard apply in appeals from decisions of bankruptcy judges in "core" proceedings.
The instant equitable subordination action is clearly a "core" proceeding as defined by the Act. In it, the general creditors seek the court-ordered subordination of the claim of a secured creditor. It thus falls within 28 U.S.C. § 157(b)(2)(O), which includes among "core" proceedings "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims."
This court must apply the Act although it was passed while the instant proceedings were pending. Section 122(a) of the Act states that except as otherwise provided Title I of the Act "shall take effect on the date of the enactment of this Act." Section 122(b) makes an exception for two sections not relevant herein which are not to apply to pending cases. Thus, it was clearly Congress' intent that the other provisions of Title I apply to pending cases. Moreover, it is a settled principle that "a court is to apply the law in effect at the time it renders its decisions, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." Bradley v. School Board of Richmond, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). In supporting the readoption of the clearly erroneous standard, the Act does not affect substantive rights of the parties, but simply establishes the procedural framework for appeals. It does not affect existing rights of the parties or cause "manifest injustice." Bradley, 416 U.S. at 716-21, 94 S.Ct. at 2018-19; Central Freight Lines, Inc. v. United States, 669 F.2d 1063, 1069-70 (5th Cir.1982); United States v. Blue Sea Line, 553 F.2d 445, 448-49 (5th Cir.1977). Accordingly, any question of the validity of the adoption of Bankruptcy Rule 8013 is rendered moot by the passage of the Act.
The only remaining question is whether it was constitutional under Northern Pipeline for Congress to provide for review under the clearly erroneous standard.
As appellants point out, the use of the clearly erroneous standard was one of the aspects of the Bankruptcy Act of 1978 that led the Supreme Court to conclude that the bankruptcy courts established by the 1978 Act were not valid adjuncts to the Article III district courts. Northern Pipeline, 458 U.S. at 84-86, 102 S.Ct. at 2878-2879 (1982). However, the plurality did not hold that the clearly erroneous standard could never be used. It mentioned use of the clearly erroneous standard as one of a number of factors which convinced it that virtually all of the "essential attributes of the judicial power of the United States" had been vested in the supposedly adjunct bankruptcy court. Id. at 84-85, 2878-2879. As this court noted in Moody v. Martin, 27 B.R. at 1000:
In setting forth the characteristics differentiating the bankruptcy courts from properly structured adjuncts to Article III courts, the plurality opinion suggests strongly that, with the exceptions of jurisdiction over "related" matters and the total grant of bankruptcy jurisdiction to the bankruptcy courts, no one of these differentiating characteristics taken alone would suffice to render a delegation scheme unconstitutional.
The Bankruptcy Amendments, while reinstating the clearly erroneous standard, place considerably greater limits on the *994 jurisdiction of the bankruptcy courts than did the Bankruptcy Act of 1978. The Amendments limit jurisdiction over related cases by requiring abstention in some circumstances, 28 U.S.C. § 1334(c)(2); give all jurisdiction over related personal injury and wrongful death claims to the district court in which the claim arose, 28 U.S.C. § 157(b)(5); and place the entire jurisdiction in the district courts, while permitting the district courts to refer to bankruptcy judges any or all cases under Title 11 or proceedings arising under or related to Title 11, 28 U.S.C. § 157(a), but also to withdraw in whole or in part any case or proceeding so referred, either on their own motion or for good cause shown. 28 U.S.C. § 157(d).
Finally, the Amendments limit application of the clearly erroneous standard to a list of enumerated "core" proceedings. 28 U.S.C. § 157. With regard to non-core proceedings, the de novo standard of review will apply. 28 U.S.C. § 157(c)(1). This limitation on the application of the clearly erroneous standard is important, since both the plurality and concurring opinions in Northern Pipeline indicated a primary concern with the extension of the bankruptcy courts' jurisdiction to traditional common law matters outside the "core" of the federal bankruptcy power. Northern Pipeline, supra, 458 U.S. at 71, 102 S.Ct. at 2871; 458 U.S. at 90-91, 102 S.Ct. at 2881-2882, (Rehnquist, J., concurring). Significantly, the only case after Northern Pipeline which held the application of the clearly erroneous standard unconstitutional, 1616 Reminc Ltd. Partnership v. Atchison & Keller Co., 704 F.2d 1313 (4th Cir.1983), did so in the non-core context of a breach of contract counterclaim and limited its holding to such traditional common law actions.
The limited application of the clearly erroneous standard to "core" proceedings does not violate either the holding or the rationale of Northern Pipeline. The Amendments reserve to the district court "most, if not all, of `the essential attributes of the judicial power,'" Northern Pipeline, supra, 458 U.S. at 87, 102 S.Ct. at 2880, and limit application of the clearly erroneous standard to proceedings within the core of the federal bankruptcy power. Accordingly, I conclude that the proper standard of review is the clearly erroneous standard adopted in Bankruptcy Rule 8013 and approved implicitly in the Bankruptcy Amendments of 1984.[1]
Appellant next contends that various findings made by the bankruptcy judge are erroneous. Appellant contends both that several of the judge's findings of fact are erroneous even under the clearly erroneous standard and that other findings are mislabeled as findings of fact but are actually conclusions of law and hence subject to plenary review. I will address each of these contentions in turn.
Under the clearly erroneous standard, the reviewing court is required to search the entire record but will reverse the lower court only if it "is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Appellant contends that under this standard the bankruptcy court's findings of fact numbers 6, 12, 18, 19, 20, 22, 23, 24, 25 and 27 are clearly erroneous.
After a thorough review of the entire record, I cannot say that any of these findings are clearly erroneous. All of the findings are supported by evidence in the record; frequently they are quotations or *995 paraphrases of testimony, including testimony by defendant's employees. The exact nature of defendant's objections is not always clear. At times it appears that defendant objects not to the findings themselves, but to inferences defendant thinks may be drawn from the finding. For example, defendant objects to finding of fact 6, that James Munson told Cenex representatives that he would "see to it that the debtors' accounts were paid on a regular basis." That was the testimony of Cenex General Manager Wiesenbeck, and defendant does not present any reason why it was clearly erroneous for the bankruptcy judge to credit it. Instead, defendant appears to complain that the judge drew erroneous conclusions from that finding. However, if such an error were shown, it would not affect the validity of the underlying finding.
At times, defendant challenges the judge's interpretation of the testimony or the inferences drawn from the testimony in making a finding. Yet, under the clearly erroneous standard, as long as the judge's inferences are reasonable and supported by the evidence, they will not be disturbed. Defendant also claims that the bankruptcy court's findings were incomplete. In some instances additional findings would have been helpful. However, for the most part the record is sufficient for purposes of review. This court may make additional findings only where there is no dispute as to the facts. Matter of Neis, 723 F.2d 584, 589 (7th Cir.1983). I have done so in a few instances, where the facts are not in dispute and such findings are helpful. Defendant also argues that findings of fact 30-43 are mislabeled and are actually conclusions of law. The distinction between findings of fact and conclusions of law is not always easy to draw. However, the distinction may be stated as the distinction between drawing inferences by the "application of logic and human experience" to the evidence, and the "application of a legal standard to historical facts." Neis, 723 F.2d at 589, quoting Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 104 (3d Cir.1981); see also In re J.A. Thompson & Son, Inc., 665 F.2d 941, 951 (9th Cir.1982).
Using this standard, findings of fact 30 and 31 are correctly labeled and will not be reversed unless clearly erroneous. Finding 30 does not involve application of a legal standard, but rather the drawing of factual inferences from previous findings of fact and testimony. Similarly, finding 31 is a finding about defendant's knowledge of the other creditors' circumstances. As the court of appeals emphasized in Neis, findings concerning the mental state of parties are almost always factual. Neis, 723 F.2d at 589. I cannot say that either finding is clearly erroneous. While different inferences could perhaps be drawn from the evidence, each finding is reasonable and supported by evidence in the record.
Findings 32 through 35 are, if anything, conclusions of law. However, I do not understand appellant to object to these findings and I can find no error in them even under the plenary review standard for conclusions of law. Findings 36 through 43 are also conclusions of law. Each involves the application of legal standards and concepts. Some, such as findings 38, 39 and 43, actually cite the legal standard being applied. Others clearly involve the application of legal concepts. The court found in findings 36 and 37 that PCA's relationship with the Osbornes approached that of a joint venture, and that its transactions with the other creditors put it in a position approaching that of a guarantor. Neither of these findings could be made without application of the legal concepts of joint venture and guarantor status. Similarly, finding 40, that PCA engaged in inequitable conduct, is virtually an ultimate conclusion under the Mobile Steel standard for equitable subordination. When conclusions of law are mislabeled as findings of fact, or when findings of fact are based on an incorrect legal standard or a correct standard improperly applied, they are subject to plenary review on appeal. Matter of Missionary Baptist Foundation, 712 F.2d 206, 209 (5th Cir.1983); In re Bubble *996 Up Delaware, Inc., 684 F.2d 1259, 1262 (9th Cir.1982).
I come at last to the substantive issue in this case: whether the bankruptcy court's findings of fact supported its ultimate conclusion that appellees are entitled to equitable subordination.
The basic test for equitable subordination of claims was set forth as follows in Matter of Mobile Steel Co., 563 F.2d at 700:
(i) The claimant must have engaged in some type of inequitable conduct.
(ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.
(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.
(Citations omitted). Plaintiffs argue that the Mobile Steel standard is not a test, but rather "criteria" or a "guideline" for use in making an ad hoc equitable determination. However, whatever label is placed on the Mobile Steel standard, it is clear that there must be a showing of some type of inequitable conduct in order to justify an exception to the general principle of equality of claims.
On the other hand, defendant claims that in the instant case, more than the Mobile Steel standard must be shown. It argues that it had neither an insider's fiduciary duty to the Osbornes nor control over the Osbornes' business. Consequently, it argues, citing Matter of Teltronics Services, Inc., 29 B.R. 139, 169 (Bkrtcy.E.D.N.Y. 1983) and Matter of W.T. Grant Co., 4 B.R. 53, 75 (Bkrtcy.S.D.N.Y.1980), that the burden of proof must remain on plaintiffs rather than shifting to the defendant as it would in a case involving an insider creditor, and plaintiffs must show egregious misconduct rather than simply inequitable conduct.
While equitable subordination of the claims of insiders or fiduciaries is more common, subordination of the claims of non-insiders has recently received considerable attention. See, e.g., Matter of Teltronics Services, Inc., 29 B.R. 139 (Bkrtcy. E.D.N.Y.1983); In re T.E. Mercer Trucking Co., 16 B.R. 176 (Bkrtcy.N.D.Tex.1981); In re Just For the Fun of It of Tennessee, Inc., 7 B.R. 166, 180-81 (Bkrtcy.E.D.Tenn. 1980); In re American Lumber Co., 5 B.R. 470 (D.Minn.1980); Matter of W.T. Grant Co., 4 B.R. 53 (Bkrtcy.S.D.N.Y.1980), aff'd 699 F.2d 599 (2d Cir.1983). As the court stated in Teltronics Services, "The primary distinctions between subordinating the claims of insiders versus those of non-insiders lie in the severity of misconduct required to be shown, and the degree to which the court will scrutinize the claimant's actions toward the debtor or its creditors." Teltronics Services, supra at 169. Once an objectant in an insider case supports allegations of impropriety with a substantial factual showing, the burden shifts to the insider creditor to prove the good faith and inherent fairness of its actions. Matter of Mobile Steel Co., 563 F.2d 692, 701-02 (5th Cir.1977). However, the burden remains on the objectant in cases involving non-insider creditors. Teltronics Services, supra at 169.
The degree of misconduct which the objectant must show in the case of a non-insider is more difficult to state. It has been variously described as "very substantial" misconduct involving "moral turpitude or some breach of duty or some misrepresentation whereby other creditors were deceived to their damage," W.T. Grant, 4 B.R. at 75, quoting In re Bowman Hardware & Electric Co., 67 F.2d 792, 794 (7th Cir.1933) (emphasis original) or as gross misconduct amounting to fraud, overreaching or spoliation, Teltronics Services, 29 B.R. at 169. However, the distinction between "inequitable conduct" and "gross misconduct" (possibly involving "moral turpitude") would seem to be a difficult one to draw in practice. There are few cases in which the gross misconduct standard has actually been applied. In Teltronics Services the court denied subordination after finding insufficient evidence of an alleged illicit takeover scheme and alleged efforts to discourage other investors. Teltronics Services, 29 B.R. at 173-74. In contrast, in *997 Just For the Fun of It the court subordinated the claim of a general contractor who filed an inaccurate notice of completion on which other creditors relied in extending additional credit to the debtor. Just For the Fun of It, 7 B.R. at 180-81. The key factor would appear to be misrepresentation on which other creditors relied to their detriment.
A further complicating factor is that creditors who are not insiders or fiduciaries will be treated like fiduciaries if they had and exerted sufficient control over the debtor, to the detriment of other creditors. Teltronics Services, 29 B.R. at 170-71; T.E. Mercer Trucking Co., 16 B.R. at 189-90; American Lumber, 5 B.R. at 478. The creditor must exercise virtually complete control to be treated as a fiduciary. Compare American Lumber, supra (control found where secured creditor took over receipt of debtor's accounts and payment of its creditors and terminated its employees) with Teltronics Services, supra, at 172 (no control despite restrictions on outside financing, monitoring finances of debtors and making recommendations on debtor's business decisions).
In the instant case, the bankruptcy judge made no finding that PCA had control over the Osbornes. However, he did find that PCA's relationship with the Osbornes "approach[ed] the status of a joint venture" and that the applicants "looked to PCA for payment of Osborne's accounts." Findings of fact 36 and 29. He also found that from August 1981 the PCA loan to the Osbornes was a "controlled" loan and that on at least one occasion PCA representatives gave the Osbornes directions on how to spend loan funds. Findings of fact 15 and 17. However, none of these findings support a conclusion that PCA exercised the type of control required by American Lumber and Teltronics Services. Undoubtedly as a result of PCA's security interest in most of the Osbornes' assets and the Osbornes' continuing need for funds, PCA had considerable power over the Osbornes. But the record contains no more than isolated examples of the exercise of that power. The facts in the record are much more analogous to those in Teltronics Services than to those in American Lumber. It is possible that at some point in November or December PCA did take control. However, the record is unclear, the bankruptcy judge made no such finding, and it does not appear that much if any of the allegedly inequitable conduct took place after PCA informed the applicants on November 6 that further payments to them would cease. Accordingly, the plaintiffs will be required to make a showing of gross misconduct.
The bankruptcy judge did not conclude that PCA had engaged in gross misconduct, but rather that it was "something in between" an insider in breach of fiduciary duty and a non-insider guilty of gross misconduct, and that it had engaged in inequitable conduct. (Finding of fact 40.) Since the plaintiffs are required to make a showing of gross or egregious misconduct, the bankruptcy judge's conclusion that PCA's claim could be subordinated based on a finding of inequitable conduct was in error. However, I will examine the record to determine whether the bankruptcy judge's factual findings support a conclusion that PCA engaged in gross misconduct. The order must be affirmed if the result is correct, even if the basis for the decision was incorrect. SEC v. Chenery Corp., 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943).
While the bankruptcy judge concluded that PCA had engaged in inequitable conduct, he was not specific about which aspects of PCA's conduct he considered inequitable. However, an analysis of his findings concerning PCA's conduct with regard to the Bank and Cenex shows that none of its conduct justified equitable subordination.
With regard to the Bank, the bankruptcy judge found first that the Bank set up a reserve account with the Osbornes in March 1981 after discussing overdraft problems with a PCA representative. (Findings of fact 9 and 10.) There is no finding that PCA induced the Bank to do so, or that PCA in any way indicated at that time that it would guarantee payment *998 of the account. Thus, the Bank's first extension of $5,000 credit to the Osbornes was not the result of any inequitable conduct on the part of PCA. The bankruptcy court next found that PCA became aware of "weakness" in the Osborne loan by March or April 1981 and that PCA agreed to "cover"[2] the Osborne reserve account in April or May. (Findings of fact 11 and 12.) These findings generated considerable controversy. Both parties interpreted finding 12 as a finding that there was a continuing agreement to cover the account. However, finding 12's cryptic statement "That in April or May, 1981, PCA agreed to cover the Osborne reserve account at the Bank" is also open to interpretation as a finding of an agreement to cover on one occasion. The testimony on which the bankruptcy judge relied supports that interpretation. See Transcript at 134. There is no evidence in the record to support a finding of a continuing transaction. Moreover, I have found as an undisputed fact that James Munson, testifying on behalf of the Bank, admitted that he received no guarantees from PCA. (Transcript at 31-32.) Accordingly, the only reasonable interpretation of finding 12 is that it concerned a single transaction in April or May 1981. That single instance in which PCA agreed to cover the Osborne account does not support a conclusion that PCA acted inequitably.
In August 1981 PCA representative Robert Accola called James Munson from the Osbornes' farm and asked the Bank to "go along" with the Munsons. Subsequently, the Bank did so by taking a $5,000 note from the Osbornes and continuing to permit overdrafts up to the previous $5,000 limit. (Findings of fact 18 and 19.) The bankruptcy court did not find that PCA made any guarantees or commitments, and indeed Munson admitted that there were no guarantees, but that he assumed as a result of his discussions with PCA that they would "take care" of him. (Transcript at 31-32.) On November 6, PCA representatives delivered to the Bank a check for $3,500, apparently to cover overdrafts by the Osbornes above the limit of their reserve account. (Finding of fact 25.) While finding 25 is again somewhat cryptic, the court made no finding that PCA admitted any obligation to cover the reserve account or the Osbornes' note.
The most that can be said on the basis of these findings is that PCA induced the Bank to continue to extend credit after it became aware of the Osbornes' financial difficulties. (Finding of fact 30.) The bankruptcy court did not find that PCA had guaranteed payment of the Osbornes' note or account, though it did conclude that PCA's position "approach[ed] . . . that of a guarantor." (Finding of fact 37.) Apparently the bankruptcy judge concluded that defendant made assurances to the Bank on which the Bank relied to its detriment. However, there are no findings of any conduct by defendant other than the instance in which it agreed to cover the Osbornes' account in the spring of 1981, and its request that the Bank "go along" with the Osbornes in August. The Bank made its original decision to set up the reserve account and its decision in August to extend $5,000 additional credit based on at most vague oral assurances from PCA. Moreover, while PCA may have had superior information about the Osbornes' finances and prospects for success, the Bank was aware of and concerned about the Osbornes' overdraft problems as early as January 1981, see Transcript at 30, and could only have been more concerned by August 1981.
On this set of facts, it cannot be said that PCA's conduct in relation to the Bank was inequitable. The Bank was aware that it was taking a risk, and that it was doing so without as much as a firm oral commitment from PCA, let alone a written guarantee. Most important, there is no finding that PCA put any pressure on the Bank, or that PCA deceived the Bank or misrepresented the situation to the Bank. The facts that the Bank believed, assumed or hoped that PCA would "take care" of it if the Osbornes *999 were unable to pay, and that PCA did not do so, do not in themselves establish inequitable conduct on the part of PCA.
With regard to Cenex, the factual findings supporting a conclusion that PCA engaged in inequitable conduct are even sparser than with regard to the Bank. In late 1976 or early 1977, James Munson told a Cenex official that he would see to it that the Osbornes' accounts were paid on a regular basis. Thereafter, when Cenex approached PCA about payment, PCA would arrange payment either through the Osbornes or, occasionally, directly. (Findings of fact 6 and 7.) In November 1981, PCA informed Cenex that it would provide no more than $1,000 more. (Finding of fact 26.)
It is difficult to understand how that conduct could be considered inequitable. PCA, as it had promised, "saw to it" that the Osbornes' account was paid regularly. However, neither the statement nor the practice contained even an implicit guarantee by PCA that Cenex would continue to be paid under all circumstances. Indeed, I have found as an undisputed fact that Cenex General Manager Wiesenbeck admitted that PCA made no "open end commitments." (Transcript at 114-15.) Thus, when PCA determined that it could no longer carry the growing Osborne debt, it was within its rights in stopping further payments to Cenex, even though it knew that Cenex would feel compelled to extend additional credit. (Finding of fact 31.) Normally a creditor may take any lawful action it sees fit in order to protect or collect its claim. As the court stated in Matter of Teltronics Services, 29 B.R. 139,
A creditor is not ordinarily a fiduciary of either his debtor or fellow creditors, and owes them no special obligation of fidelity in the collection of his claim. . . . [A] creditor normally has an unqualified right to call a loan when due, to refuse to extend a loan for any cause or no cause at all, and to lawfully enforce collection.
29 B.R. at 169-70 (citations omitted); accord, In re W.T. Grant Co., 699 F.2d 599, 610 (2d Cir.1983). Since PCA had not guaranteed payment to Cenex, it was justified in stopping further payments.
Finally, I turn to PCA's conduct with regard to General. As with Cenex, PCA made several direct payments to General. (Finding of fact 14.) However, based on that fact alone General could not reasonably rely on PCA making such payments in the future. Thus, the direct payments did not make PCA's eventual refusal to pay inequitable. The only substantial basis for General's application for subordination is a series of conversations between General and PCA beginning in September 1981.
General initiated the meetings in early September out of concern regarding the Osbornes' account, which had gone unpaid for some time. (Finding of fact 20.) PCA and General did not discuss payment, however, but other matters such as the performance of the cattle and communication problems with the Osbornes. (Transcript at 80, 86.) The bankruptcy judge found that at a second meeting between PCA and General on October 19 General did raise the subject of payment and PCA responded that funds could be released once some cattle were sold. (Findings of fact 21 to 23.) Thereafter, General called PCA more than once and was told that payment would be forthcoming once some papers were signed. (Finding of fact 24.) However, apparently no payments were made until November 20, when PCA agreed to pay General $1,000 in response to a threat by General to stop delivery. (Finding of fact 27.)
These findings support a conclusion that PCA's conduct in regard to General was at least inequitable. PCA clearly was aware of General's concern about the size of the Osbornes' account. PCA responded with equivocation and outright misrepresentations concerning forthcoming payment. PCA continued to reassure General even in the weeks immediately preceding its decision to terminate its support for the Osbornes, a decision which it must have known made General's prospects for payment bleak to nonexistent. Moreover, this *1000 course of conduct was clearly deliberate, since the bankruptcy judge found on the basis of the testimony of PCA employees that PCA had anticipated a request for payment prior to the October 19 meeting and planned their less than forthright response. (Finding of fact 23; Transcript at 140, 146.)
Defendant's response is less than convincing. Defendant argues that the testimony supports a finding only that PCA told General that "funds would be released" when the Osbornes signed some papers, not the judge's actual finding that PCA told General "payment would be forthcoming." This argument is disingenuous. If indeed PCA told General that funds would be released but did not mean that the funds would be released to General, it was deliberately misleading General. Defendant argues also that part of the debt owed to General was the result of a dispute between General and the Osbornes. However, that argument does not negate a finding of inequitable conduct but merely suggests that not all of General's losses were attributable to PCA's inequitable conduct.
The question then is whether PCA's conduct with respect to General rose to a level of gross or egregious misconduct. Just For the Fun of It suggests that the standard is satisfied by "misrepresentation whereby other creditors were deceived to their damage." 7 B.R. at 181. I conclude that PCA's conduct toward General satisfied this standard. PCA repeatedly made misrepresentations to General concerning the prospects for payment. PCA obviously had both superior knowledge concerning the Osbornes' ability to pay and a superior position due to its security interests in virtually all of the Osbornes' assets. Moreover, it knew that General in particular would feel compelled to continue selling feed to preserve the cattle, although PCA was the only party likely to benefit. I conclude that PCA's misrepresentations led General on to continue delivering feed to the Osbornes despite their steadily growing account, and that misconduct on the part of PCA caused injury to General.
However, as appellant points out, a claim should be subordinated "only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct." Mobile Steel, 563 F.2d at 701. Accordingly, PCA's claim should be subordinated to that of General only to the extent that General's claim resulted from PCA's misconduct. Since the bankruptcy judge made no findings on this issue I will remand to the bankruptcy court to determine the amount of General's claim to which PCA's claim should be subordinated. Based on my disposition of this case, it is unnecessary to consider the parties' other contentions.
The order of the bankruptcy court is affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.
NOTES
[1] Appellants' challenge to the validity of the adoption of Bankruptcy Rule 8013 would fail even if the Bankruptcy Amendments had not been adopted. Reinstatement of the clearly erroneous standard did not by itself impermissibly extend jurisdiction or affect the substantive rights of the parties. At least as applied to proceedings within the core area of federal bankruptcy power, application of the clearly erroneous standard has been routinely upheld. In re Morrissey, 717 F.2d 100, 104 (3d Cir.1983); Matter of Missionary Baptist Foundation, 712 F.2d 206 (5th Cir.1983). But see 1616 Reminc Ltd. Partnership v. Atchison & Keller Co., 704 F.2d 1313 (4th Cir.1983) (clearly erroneous standard unconstitutional when applied to traditional common law action).
[2] The term "cover" is used both in the findings of fact and the underlying testimony. The nature and extent of the agreement to cover is not clear from the record.