HOLLOWAY, Chief Judge.
After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. See Fed.R. App.P. 34(a); Tenth Circuit R. 10(e). The cause is therefore ordered submitted without oral argument.
Debtors, Wayne and Dorothy Reid, filed a voluntary petition in bankruptcy on NoVember 2, 1981, seeking to exempt certain paintings from attachment for payment of debts under Okla.Stat. tit. 31, § 1(A)(3) and (7) (Supp.1980).[1] Objections were filed by the trustee in bankruptcy and by creditors, pjrst Bank of Catoosa (First) and Community Bank & Trust Co. (Community).
First commenced this action in the bankruptcy court on November 24, 1981, claiming that the paintings were not exempt and that debtors could not avoid security interest liens on the property under 11 U.S.C. § 522(f).[2] Community was allowed to intervene in the action on December 18, 1981. On March 31,1982, a hearing was held, and on April 1, 1982, the bankruptcy court entered an order and judgment in favor of creditors. The district court affirmed the judgment on July 30, 1982. Debtors appeal. We affirm.
I
Facts
Debtors, Wayne and Dorothy Reid, operated a family business known as Interna *232 tional Mailing Systems (IMS). Ill R. 31-32. Billy James Hargis of the Christian Crusade was a customer of the business and owed the debtors money for printing and mailing services they had provided for him at IMS. Ill R. 25-26. In payment of this debt, Hargis gave the Reids fifteen religious paintings that had previously hung on display in Hargis’ office building. Ill R. 17-18. These pictures were described as large, “classic religious paintings,” around 200 to 300 years old, with carved frames and valued at approximately $187,-000. Ill R. 15, 17, 41, 52. The paintings all depicted religious figures. Ill R. 6, 41.
Debtors received six of the paintings on June 10, 1980, and the remaining nine in November 1980.[3] Ill R. 39. They hung these paintings throughout their house. Ill R. 8-9, 39-40. On June 16, 1980, debtors pledged the six paintings they received in June to Community as collateral for a loan. Ill R. 19-20. Wayne Reid testified that he used the loan proceeds exclusively for business purposes. Ill R. 22-23. On April 9, 1981, debtors pledged the nine paintings received in November 1980 to First as collateral for a loan; in their request for the loan, debtors indicated that they would attempt to pay off the loan by selling some of the paintings and that the loan proceeds would be used “as partial payment [of] ... personal and business taxes for the years of 1980 and 1979.” Ill R. 15-17, 55. Wayne Reid testified, however, that the loan was a “business loan” and that the loan proceeds were used in one of his businesses. Ill R. 27. Debtors indicated in both security agreements, on forms furnished by First and Community, that the collateral was held by them primarily for personal, family and household use. Ill R. 33-35. The debtors stress the latter wording in the agreements made with creditors as strong evidence that First and Community recognized the personal, family and household use of the paintings.
In the bankruptcy proceedings, debtors claimed that the paintings were exempt from attachment by First and Community under the Oklahoma exemption statute and that the liens could be avoided pursuant to 11 U.S.C. § 522(f). As a preliminary matter, the bankruptcy court assumed, without deciding, that the paintings fell within the category of personal property described in Okla.Stat. tit. 31, § 1(A)(3) or (7), and found that the creditors’ security interests were nonpossessory, non-purchase money liens subject to 11 U.S.C. § 522(f) avoidance provisions. Ill R. 77-78.
The court went on to find that the paintings were not exempt and the liens were not avoidable because, under all the circumstances, the paintings were not held primarily for personal, family or household use. The court instead found that, although the paintings were located in debtors’ home, their “most important use ... [was] pledging them commercially for commercial loans.” Ill R. 80. The court based this conclusion on initial findings that the paintings were received by debtors as payment on a series of commercial transactions; the paintings were pledged as collateral for business loans soon after debtors received them and placed them in their home; and debtors themselves indicated in their list of assets that the paintings were a “unique collection” by not incorporating them into their general description of furniture, fixtures and accessories. Ill R. 79.
The district court affirmed the bankruptcy court’s decision, holding that the classification of the paintings was a question of fact and that the bankruptcy court’s findings on this issue were not clearly erroneous. I R. 89. This appeal followed.
II
The sole issue to be decided on appeal is whether the bankruptcy court erred in finding the paintings were not exempt *233 because they failed to meet the qualification established in both the Oklahoma exemption statute and 11 U.S.C. § 522(f), that the items be held primarily for personal, family or household use.[4] Debtors contend that the court’s findings of fact on this issue were clearly erroneous. They specifically argue that the court’s findings that the paintings were received by debtors as a business entity in a commercial transaction and were pledged as collateral for business loans, were erroneous because Hargis gave the paintings to them as individuals and the loan proceeds were used for payment of personal taxes. Brief of Appellants 9-10. Debtors also assert that the court erred in finding that the paintings were primarily used “commercially for commercial loans” because the security agreements with First and Community show the paintings were held for personal, family or household use. Id. at 9. They argue that the paintings were in fact used primarily as items of household furniture and were part of the decorations of their home; debtors contend that this “original use and use in the first place” could not be overcome by the fact that the paintings were later pledged as collateral for loans. Id. at 13-15.
As a court of appeals, we are bound by Bankruptcy Rule 8013 (formerly Bankruptcy Rule 810) and Fed.R.Civ.P. 52(a) to accept the findings of the bankruptcy judge unless they are clearly erroneous. Leaseamerica Corp. v. Eckel, 710 F.2d 1470, 1474 (10th Cir.1983); Farmers Co-Operative Ass’n of Talmadge, Kansas v. Strunk, 671 F.2d 391, 395 (10th Cir.1982); In re White House Decorating Co., 607 F.2d 907, 910 (10th Cir.1979). The district court itself properly used the clearly erroneous standard for reviewing the findings of fact of the bankruptcy judge,[5] as we also do. The bankruptcy court’s findings should not be disturbed absent “the most *234 cogent reasons appearing in the record.” Kansas Federal Credit Union v. Niemeier, 227 F.2d 287, 291 (10th Cir.1955); see also In re Vickers, 577 F.2d 683, 687 (10th Cir.1978); Wolfe v. Tri-State Insurance Co., 407 F.2d 16, 19 (10th Cir.1969).
Contrary to debtors’ claims, sufficient evidence was introduced in the bankruptcy hearing to support the court’s initial findings of fact that the paintings were received “as payment upon a series of commercial transactions ... conducted by ... one of the [Reids’] business entities” and that the paintings were pledged commercially for business loans. See III R. 79. Wayne Reid testified on numerous occasions that the loan proceeds were used for *235 business purposes. Ill R. 22-23, 27, 37. Lending agents who dealt with debtors also testified that debtors sought the loans for use in their businesses. Ill R. 51, 61.
In addition, the following evidence in the record supports the court’s finding that the paintings were received by debtors as a business entity: testimony that the Reids owned and operated the IMS company and that IMS had 25 employees, some of whom were not members of the Reid family (III R. 31-32, 42-43, 45-46); testimony that debtors received the paintings from Hargis as payment of debts owed for IMS printing and mailing services (III R. 17, 25); testimony that “credit” was given to Hargis’ company accounts in the amount of $125,-000 for the paintings (III R. 26-27, 47); and Dorothy Reid’s testimony that debtors were seeking to discharge in bankruptcy some of the costs incurred by their businesses “in producing this $125,000 worth of work” (III R. 47).
In finding that “the most important use [of the paintings was] pledging them commercially for commercial loans,” the bankruptcy court was not required to adopt the characterization of the goods given in the security agreements. See, In re Currie, 34 B.R. 745, 747-48 (D.C.D.Kan.1983) (evidence establishing that collateral was actually used as “tools of trade” controlled over the security agreement classification of collateral as consumer goods held for family, personal or household purposes); In re Noggle, 30 B.R. 303, 305 (Bkrtcy.E.D. Mich.1983) (“classification of property in a security agreement is not dispositive of questions dealing with whether the property may be claimed as exempt or whether a lien on such property may be avoided”).
It was also proper for the bankruptcy court to find that, even though the paintings were located in debtors’ home, they were primarily used for business rather than personal, family or household purposes. Cf. 3 Collier on Bankruptcy If 522.-12, at 522-50.1 (1984) (“[presumably, those goods which are primarily for occupational use ... do not fall within the [personal, family or household use] exemption, even though there may also be a secondary personal use”); Security Building & Loan Ass’n v. Ward, 174 Okl. 238, 50 P.2d 651, 656 (1935) (even though goods may have characteristics of “household furniture,” courts have held “with practical unanimity that furniture devoted to commercial purposes does not fall within the exemption statute”); In re Jones, 5 B.R. 655, 657-58 (Bkrtcy.M.D.N.C.1980) (in holding that a tractor and mower were exempt “household goods,” the court relied on the fact that the goods were never used for any commercial venture and that no evidence was presented showing the debtor purchased the goods with the intent to use them for other than household purposes).
Here, the bankruptcy court could find that the paintings were intended for other than household purposes because they were received by debtors as payment on a debt owed to IMS, and were thus held by debtors for the business rather than for their own personal use. The court could also find that the goods were primarily used for business rather than personal, family or household purposes because (1) debtors received the paintings as payment on a business debt and pledged them as collateral for business loans within a period of six days for the first installment and a period of a few months for the second installment; and (2) debtors stated that they would sell some of these paintings to pay off a business loan. When viewed in conjunction with the fact that the bankruptcy court could properly find the paintings to be a “unique collection,”[6] these *236 findings sufficiently support the court’s conclusion that the paintings were not held primarily for personal, family or household use.
We believe that we are acting consistently with the purposes of the Oklahoma exemption statute and 11 U.S.C. § 522(f) in holding that the bankruptcy court did not err in its ruling. “The purposes of the exemption statute are to prevent improvident debtors from becoming subjects of charity by preserving to them sufficient definitely classified property that they may maintain a home for themselves, and to prevent inconsiderate creditors from depriving them of the necessities of life.” Security Building & Loan Ass’n v. Ward, 50 P.2d at 657; see also In re Fisher, 11 B.R. 666, 668 (Bkrtcy.W.D.Okla.1981). But, “this is not to say that ... all items of personal property that a debtor uses in his home may be ... exempted. Each- case will be evaluated on its merits with regard to its own particular facts and circumstances to prevent abuses by either creditors or debtors.” In re Fisher, 11 B.R. at 669. This case does not involve “inconsiderate creditors” depriving debtors of the necessities of life, nor was it improper for the bankruptcy court to find that the paintings were not primarily used for maintenance of debtors’ home.
Ill
Conclusion
For these reasons, the judgment of the district court affirming the bankruptcy court’s findings concerning the exemption and lien avoidance status of the paintings is
AFFIRMED.

. Under 11 U.S.C. § 522(b), the debtor is allowed to choose between exemptions provided by the state where he has been domiciled or exemptions listed in § 522(d) of the federal Bankruptcy Code. See 3 Collier on Bankruptcy fi 522.02, at 522-11 (1984). Section 522(b) provides that "an individual debtor may exempt from property of the estate ... (2)(A) any property that is exempt under ... State or local law that is applicable on the date of the filing of the petition at the place in which the debtor’s domicile has been located." (Emphasis added).
The pertinent portion of the Oklahoma exemption statute provides as follows:
[T]he following property shall be reserved to every person residing in the state, exempt from attachment or execution and every other species of forced sale for the payment of debts, except as herein provided:
(3) All household and kitchen furniture held primarily for the personal, family or household use of such person or a dependent of such person; ...
(7) All books, portraits and pictures, and wearing apparel, that are held primarily for the personal, family or household use of such person or a dependent of such person[.]
See Okla.Stat. tit. 31, § 1 (Supp.1980). This version of the exemption statute, which became effective on June 25, 1980, is applicable here because the debtors’ petition in bankruptcy was filed in November 1981. See 11 U.S.C. § 522(b)(2)(A); In re Maride, 25 B.R. 36, 38-39 (Bkrtcy.N.D.Tex.1982) (”[n]ormally the date upon which the bankruptcy petition is filed is the relevant date for determination of exemption issues").

. Section 522(f) provides in part as follows: Notwithstanding any waiver of exemptions, the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled ..., if such lien is—
(2) a nonpossessory, nonpurchase-money security interest in any—
(A) household furnishings, household goods ... that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor[.]

. Wayne Reid testified at first that he received the first installment of paintings in March 1980. Ill R. 21-22. However, he later stated that he did not remember when he received the paintings. Ill R. 24. Dorothy Reid testified that the first six paintings were received on June 10, 1980 and that the remaining nine paintings were received in November 1980. Ill R. 39. Debtors indicated those were the proper dates of receipt in their brief on appeal. See Brief of Appellants 4.

. Debtors do raise other issues on appeal by arguing that (1) the value of the paintings should not have affected their exemption status, and (2) the bankruptcy court should have found the paintings to be exempt because they were "household furniture” within the meaning of Okla.Stat. tit. 31, § 1(A)(3), and "portraits and pictures” within the meaning of Okla.Stat. tit. 31, § 1(A)(7). We, however, will not address these issues here; their resolution is not necessary for disposition of this case because the bankruptcy court's decision was not based on findings concerning the effect of the paintings’ value or their classification as "household furniture” or "portraits and pictures." The bankruptcy court in fact assumed that the paintings fell within the exemption categories described in the Oklahoma statute.
Classification as "household furniture” or "portraits and pictures" does not mean that the paintings are automatically exempt. See Security Building & Loan Ass'n v. Ward, 174 Okl. 238, 50 P.2d 651, 656 (1935) ("it was manifestly not contemplated by the statute that any and all furniture ... should, by virtue of its character as household furniture, be considered exempt”). Although under Oklahoma law "exemption laws ... should be liberally construed to comport with their beneficient spirit of protecting the family home, a liberal construction cannot be the means of defeating a positive law or a rule established by judicial precedent.” In re Estate of Wallace, 648 P.2d 828, 833-34 (Okla.1982). The legislatures here have expressly provided in both the exemption and lien avoidance statutes that the items which fall within the applicable exemption categories must be "held primarily for ... personal, family or household use.” Cf. In re Estate of Wallace, 648 P.2d at 834 (occupation is an express condition in the Oklahoma homestead exemption statute required for the homestead to vest); In re Fisher, 11 B.R. 666, 667 (Bkrtcy.W.D.Okla.1981) (the Oklahoma legislature placed a qualification on the "household and kitchen furniture exemption” by requiring such furniture to be held primarily for the personal, family or household use of the debtor or his dependent). We therefore believe that the bankruptcy court did not err in relying on that qualification to find that the paintings were not exempt and the liens not avoidable, although the paintings may have been "household furniture” within the meaning of Okla.Stat. tit. 31, § 1(A)(3) and 11 U.S.C. § 522(f), or "portraits and pictures” within the meaning of Okla.Stat. tit. 31, § 1(A)(7).

. The Fourth Circuit has held that in proceedings which do not fall within the core area of bankruptcy power, the clearly erroneous standard of review "unconstitutionally vest[s] the non-Article III bankruptcy referee with too great a measure of the judicial power of the United States.” See 1616 Reminc Ltd. Partnership v. Atchison & Keller Co., 704 F.2d 1313, 1318 (4th Cir.1983) (relying in part on the rationale of Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73.L.Ed.2d 598 (1982), where the Supreme Court held that the Bankruptcy Act of 1978 unconstitutionally conferred Article III judicial power upon non-Articlc III judges in granting bankruptcy courts jurisdiction over all civil pro *234 ceedings arising under title 11 of the bankruptcy code). We conclude that the clearly erroneous standard of review is appropriate in this core bankruptcy proceeding under both the 1978 Bankruptcy Act and the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98-353, 1984 U.S.Code Cong. & Ad. News (98 Stat.) 333.
Congress has indicated in the 1984 Bankruptcy Amendments that the clearly erroneous standard is to apply in appeals from decisions of bankruptcy judges in "core proceedings arising under title 11." See Pub.L. No. 98-353, §§ 157(b) and 158(c), 1984 U.S.Code Cong & Ad.News (98 Stat.) 340-41. As explained in In re Osborne, 42 B.R. 988, 993 (D.C.W.D.Wis.1984):
28 U.S.C. § 157 now enumerates a number of "core proceedings” and provides for de novo review only for proceedings which are not "core proceedings." 28 U.S.C. § 157(c)(1). 28 U.S.C. § 158 also provides that appeals from decisions of bankruptcy'judges "shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts____” 28 U.S.C. § 158(c). Since Rule 52(a), Federal Rules of Civil Procedure, applies the clearly erroneous standard to appeals taken from district courts to courts of appeals, the clear implication of both § 158(c) and the special de novo review procedure of § 157(c)(1) is that Congress intended that the clearly erroneous standard apply in appeals from decisions of bankruptcy judges in "core" proceedings.
Here, the bankruptcy case was a "core proceeding" because it involved the determination of "exemptions from the property of the estate,” defined as a "core proceeding" under § 157(b)(2)(B) of the 1984 Act. We are in accord with In re Osborne that it was constitutional under Northern Pipeline for Congress to provide review under the clearly erroneous standard; the Bankruptcy Amendments place greater limits on the jurisdiction of the bankruptcy courts and limit application of the clearly erroneous standard to a list of enumerated "core proceedings". Id. at 993-94. We also agree with the court's conclusion that it is appropriate to apply the clearly erroneous standard of the 1984 Act to cases pending on the date of the Act’s enactment; the Act specifically provided that it would take effect on the date of enactment and readoption of the clearly erroneous standard docs not affect the existing substantive rights of the parties, "but merely establishes the procedural framework for appeals.” Id. at 993; see also Carlton v. Baww, Inc., 751 F.2d 781, 787 n. 6 (5th Cir.1985).
Even if the Bankruptcy Amendments had not been adopted, we believe this case is distinguishable from Reminc and Northern Pipeline because it falls within the core area of federal bankruptcy power. In Northern Pipeline, 458 U.S. at 71, 102 S.Ct. at 2871, the Court stated that "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages that is at issue in this case.” See also John E. Burns Drilling Co. v. Central Bank of Denver, 739 F.2d 1489, 1493-94 (10th Cir.1984) (per curiam). "Significantly, the only case after Northern Pipeline which held the application of the clearly erroneous standard unconstitutional, [Reminc ], did so in the non-core context of a breach of contract counterclaim and limited its holding to such traditional common law actions.” In re Osborne, 42 B.R. at 994. Since application of the clearly erroneous standard has been "routinely upheld” in proceedings within the core area of federal bankruptcy power, we conclude that it is also appropriate to apply the standard in this core proceeding involving only "the restructuring of debtor-creditor relations.” See In re Osborne, 42 B.R. at 994 n. 1.
Moreover, Northern Pipeline is not applicable here because the district court affirmed the bankruptcy court’s decision before the Court’s prospective ruling. See Northern Pipeline, 458 U.S. at 88, 102 S.Ct. at 2880, 459 U.S. 813, 103 S.Ct. 199, 74 L.Ed.2d 160 (1982) (case to apply only prospectively after December 24, 1982). Application of the new jurisdictional rules is not appropriate where claims were "fully litigated by the bankruptcy judge and the district court and were pending appeal before the effective date of Northern Pipeline and Reminc." In re Twin Parks Ltd. Partnership, 720 F.2d 1374, 1377 (4th Cir.1983), cert. denied, -U.S.-, 104 S.Ct. 1602, 80 L.Ed.2d 132 (1984); see also Mitsubishi International Corp. v. Clark Pipe & Supply Co., 735 F.2d 160, 163 (5th Cir.1984) (the clearly erroneous standard of review applies where the district court has affirmed the bankruptcy judge’s findings before Northern Pipeline was decided).

. The following evidence in the record supports the bankruptcy court’s finding that the paintings constituted a "unique collection”: debtors listed the paintings in Schedule B-2 and B-4, Statement of All Property of Debtor, as a separate and distinct asset and thus did not include them in the general category of "household goods” (II R. 3); testimony was given that Wayne Reid characterized the paintings as an "art collection" (III R. 53-54); debtors listed the paintings as "antique art objects and paintings” in their "Statement of Condition" (III R. 14); the paintings were described as "classic religious paintings” and had previously hung on display for *236 public viewing (III R. 17-18); and testimony was given that the paintings "were not pictures that you would hang on your walls in your own personal home,” but rather "needed to be on exhibit in a gallery.” (Ill R. 62-63).