**In re Delma L. BURNER, Debtor.**

**Delma L. BURNER and Liquidating Agents for The Estate of Delma L. Burner, Plaintiffs,**

v.

**SECURITY STATE BANK, Defendant.**

**Bankruptcy No. 87–30450.
Adv. No. 88–3067.**

United States Bankruptcy Court,
W.D. Texas,
El Paso Division.

Dec. 26, 1989.

---

Wiley F. James, III and Bernard R. Given, II, Grambling & Mounce, El Paso, Tex., for plaintiff, Delma L. Burner.

Bernard D. Felsen and Myron D. Brown, Scott, Hulse, Marshall, Feuille, Finger & Thurmond, El Paso, Tex., for plaintiff, Liquidating Agents for Bankruptcy Estate of Delma L. Burner.

William Monroe Kerr, Kerr, Fitz–Gerald & Kerr, Midland, Tex., for defendant, Sec. State Bank.

## OPINION

RONALD B. KING, Bankruptcy Judge.

Delma L. Burner, the reorganized Debtor under a confirmed Plan of Reorganization, and the liquidating agents under the Plan (collectively referred to as the "Debtor"), filed this adversary proceeding to obtain a variety of relief against Security State Bank of Pecos, Texas (the "Bank"). The Debtor alleged that the Bank has withheld property which rightfully belongs to the bankruptcy estate. The Debtor also alleged that the Bank received insider preferences and committed acts which justify equitable subordination of the Bank's claims against the Debtor.[1] The Debtor's requests for turnover will be granted in part, but all other requested relief will be denied.

---

1. 11 U.S.C. §§ 510(c), 542 & 547(b) (1982 & Supp. V 1987). Title 11 is generally referred to herein as the Bankruptcy Code.

## I.

### FACTS

The facts in this adversary proceeding are convoluted. Both parties have made numerous allegations regarding the genesis and interpretation of the numerous loan, security and bankruptcy case documents before this Court. The factual findings in this portion of this Opinion will be limited to only those facts evidenced by the documents or agreed upon by the parties:

1. The Debtor was married to Jess Burner until Jess Burner's death in March, 1987. Mr. Burner and the Bank had a long standing business relationship for a period of approximately thirty years during which Jess Burner had obtained a series of loans from the Bank for his cattle and ranching businesses. His primary contact at the Bank was its president, Mr. Dudley Montgomery.

2. Jess Burner executed a Last Will and Testament which named both his wife, Delma L. Burner, and Dudley Montgomery as co-executors of his estate. After Jess Burner's death, the Debtor and Mr. Montgomery were appointed co-executors of the probate estate pursuant to the will.

3. In November, 1986, Jess Burner and the Bank executed a loan agreement and promissory note in the principal amount of $1,520,000.00 which renewed and extended prior loans and further extended Jess Burner's line of credit. By virtue of this loan agreement, the Bank was given additional collateral to secure the Burner indebtedness. This collateral included a deed of trust on the Debtor's Presidio County, Texas real property, and pledges of shares of stock of JDJC Cattle Corporation, BHMT Cattle Corporation and Champion Feeders, Inc.

4. Subsequent to Jess Burner's death in March, 1987, Delma L. Burner filed for Chapter 11 relief on June 9, 1987. Included within the bankruptcy estate were all community assets of Jess and Delma L. Burner, as well as Mrs. Burner's separate property.

5. On or about June 15, 1987, the Debtor and the Bank executed a promissory note in the principal amount of $1,500,-000.00 and a loan agreement which constituted a post-petition financing agreement. The June, 1987 agreement served as an extension of the renewal note previously negotiated between Jess Burner and the Bank in November, 1986. Corporate shares of the Security State Bank ("SSB stock") and the Bank of New Mexico Holding Company ("BNMHC stock") were originally included in the June, 1987 post-petition loan agreement as security for the note, but those provisions were stricken and initialed by the parties at the time of the execution of the post-petition loan agreement. The SSB stock and BNMHC stock had not previously been pledged to the Bank as security for Jess Burner's indebtedness. The Agreement and Stipulation Regarding Use of Cash Collateral and Order Thereon (the "Cash Collateral Agreement") was executed contemporaneously with the post-petition loan agreement.

6. On September 8, 1987, the Cash Collateral Agreement was approved by the Bankruptcy Court in the Order Granting Motion for Authority to Use Cash Collateral (the "Cash Collateral Order"). A significant provision of the Cash Collateral Order was the limitation of the Bank's lien status to that as of the date of the bankruptcy petition.

7. On April 22, 1988, a confirmation hearing was held on the Debtor's Plan of Reorganization (the "Plan"). On May 11, 1988, the Debtor's Plan was confirmed by written order, but effective as of April 22, 1988.

8. In April, 1988, the Debtor received a cash dividend from Champion Feeders, Inc. in the amount of $105,832.57. Because the Bank had a lien on the shares of stock, the Debtor paid the money dividend to the Bank.

9. In June, 1988, the Bank sold the 986 shares of the BNMHC stock which were security for a loan which had been purchased postpetition by the Bank from First National Bank of Amarillo, Texas (the "Amarillo Bank"). The BNMHC stock had

been pledged by Jess Burner to the Amarillo Bank to secure a promissory note in the principal amount of $5,000.00. After purchase of the note, secured by the BNMHC stock, for the outstanding principal and interest of $5,400.66, the Bank sold the stock for $88,740.00. The Bank paid itself the outstanding debt on the Amarillo Bank note and retained the excess proceeds from the sale to apply to the other indebtedness owing by the Debtor to the Bank.

10. In July, 1988, the Bank sold the 1,306 shares of SSB stock on which it claimed a lien, and applied the $78,360.00 proceeds of sale to the Debtor's indebtedness owing to the Bank.

11. On August 11, 1988, the Debtor initiated this adversary proceeding by filing the "Complaint to Compel Turnover of Property of the Estate Pursuant to 11 U.S.C. § 542 and to Subordinate Claim of Security State Bank Pursuant to 11 U.S.C. § 510(c)."

## II.

### ISSUES

Given these findings of fact, the contested issues may be summarized as follows:

1. The Bank contends that this Court has no jurisdiction to administer the assets of the probate estate of Jess Burner.

2. The Debtor claims that the $105,-832.57 cash dividend from the Champion Feeders, Inc. stock is property of the Debtor's estate and should be turned over by the Bank.

3. The Debtor asserts that the sale proceeds of $88,740.00 resulting from the sale of the BNMHC pledged stock secure only the $5,400.66 outstanding indebtedness on the Amarillo Bank note, and that the excess proceeds are property of the estate. The Bank argues, however, that the proceeds from the sale of the BNMHC stock

secure not only the indebtedness on the Amarillo Bank note, but also secure the entire outstanding indebtedness of the Debtor to the Bank by cross-collateralization provisions in the Bank's loan documents.

4. The Debtor claims entitlement to the $78,360.00 proceeds from the sale of the 1,306 shares of SSB stock because the Bank had no security interest in such shares.

5. The Debtor alleges that the close association between Jess Burner, the Debtor, and Dudley Montgomery allowed the Bank to operate as an insider with respect to the disposition of property of both the probate and the bankruptcy estate.

6. The Debtor contends that Mr. Montgomery's acts as an insider detrimentally affected the distribution of the property of the estate to the other creditors, and that the claims of the Bank should be subordinated pursuant to section 510 of the Bankruptcy Code.

7. The Debtor maintains that the pledges of assets pursuant to the November, 1986 loan agreement[2] should be avoided as insider preferences pursuant to section 547(b) of the Bankruptcy Code because said pledges occurred within one year prior to the bankruptcy filing.

## III.

### JURISDICTION

 This Court has jurisdiction of this "core" proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (F) & (O), and 1334 (1982 & Supp. V 1987). There has been much debate by the parties regarding the propriety of a bankruptcy court administering the probate assets of a decedent's estate.[3] This Opinion does not hold or imply that a decedent's estate may file and administer its affairs through a bankruptcy

---

**2.** *See* Finding of Fact number 3, *supra.*

**3.** It is possible that the estate of an individual who files bankruptcy and subsequently dies could be administered in a Chapter 7 or 11 case, depending on the circumstances. A decedent's estate, however, may not file bankruptcy or convert to a different chapter under the Bank-

ruptcy Code. *In re Jarrett,* 6 C.B.C.2d 496, 497, 19 B.R. 413 (Bankr.M.D.N.C.1982). *See* H.R. Rep. No. 595, 95th Cong., 2d Sess. 1,313, reprinted in 1978 U.S.Code Cong. & Admin. News 5963, 6270 (definition of "person" who may file bankruptcy does not include an estate or a trust).

case. Rather, this Opinion holds that upon confirmation of a Chapter 11 plan of reorganization, those parties who voted in favor of the plan and did not file objections or an appeal are bound by the terms of the Chapter 11 plan. *See* 11 U.S.C. § 1141 (1982 & Supp. V 1987); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir.1987); *In re Bludworth Bond Shipyard, Inc.*, 93 B.R. 520 (Bankr.S.D.Tex.1988); *In re Fortner Oilfield Serv., Inc.*, 49 B.R. 9 (Bankr. N.D.Tex.1984). By failing to file an objection to the Plan, by casting a ballot accepting the Plan, and by not attacking the confirmation order by appeal, the Bank has waived any right to object to either the jurisdiction of the Bankruptcy Court or the provisions set forth in the Plan. In addition, the Bank filed an adversary proceeding in this Court challenging this Court's jurisdiction over the probate estate. The relief requested by the Bank was denied and the judgment has become final and nonappealable. Consequently, the confirmation of the Plan, the effect thereof under section 1141, and the prior adversary proceeding all preclude any right of the Bank to object to this Court's jurisdiction over the probate estate or the issues in this adversary proceeding.

## IV.

## TURNOVER ACTIONS

The Debtor alleged three causes of action for turnover under section 542 which will be discussed separately.

### A. *Dividend relating to pledged corporate stock.*

■ The issue in the first cause of action is which party is entitled to cash dividends from shares of corporate stock pledged to the Bank as collateral for a loan. Jess Burner pledged 60,000 shares of Champion Feeders, Inc. stock to the Bank to partially secure his indebtedness to the Bank. Jess Burner executed this pledge in May, 1986 by physically delivering to the Bank possession of his stock certificates, executed stock assignments in blank, and an executed Security Agreement—Pledge of Collateral.

Subsequent to the filing for Chapter 11 relief, the collateral pledge agreement, along with other security documents, were renewed with the authorization of this Court by the Cash Collateral Order. The Cash Collateral Order attempted to define and limit the Bank's lien status as to the Debtor's property, but it failed to provide for the treatment of dividends attributable to the stock. The confirmed Plan provided for abandonment to the Bank of all of the Debtor's collateral securing the Bank's claim, including the Champion Feeders stock previously pledged. Shortly before confirmation of the Plan, however, Champion Feeders, Inc. paid a $105,832.57 dividend on the pledged stock. The cash dividend was delivered to Delma Burner who in turn delivered it to the Bank.

The Debtor contends that she has been wrongfully deprived of the cash dividend proceeds. The Debtor maintains that the Cash Collateral Order stipulated that the Bank was precluded from asserting a lien on the Debtor's cash or cash collateral. As such, the Debtor believes that the Bank's rights to the Champion Feeders dividend were established solely by the pre-petition pledge of collateral. Neither the pre-petition pledge nor the Cash Collateral Order made reference to the payment of dividends. The confirmed Plan provided for the discontinuance of payments under the post-petition loan agreement and abandonment of the stock to the Bank. Consequently, the Debtor contends that the Bank had no claim to cash collateral of the Debtor including cash dividends on pledged stock paid prior to the abandonment of the stock to the Bank under the Plan.

In contrast, the Bank argues that this matter is governed by basic commercial law concerning pledges. The Bank cites the general proposition that stock pledges create a security interest not only in the stock, but also in any dividends attributable to the stock. The Bank contends that the law imposes a duty on the pledgee to either apply the dividend received to the debt, or to remit the dividend to the debtor. This rule is supported by the common law recognition that absent an agreement to the con-

trary, dividends are to be used to satisfy any outstanding indebtedness owed to the pledgee. In addition, the absence of any agreement regarding the disposition of the dividends in both the Cash Collateral Order and the confirmed Plan gave the Bank the option to apply the dividends to any outstanding debt. In this instance, the Bank elected to apply the dividend to the Burner debt.

Upon review of the pleadings and relevant case law, the Court finds that the Bank properly exercised its right as pledgee to apply the dividend to the Burner indebtedness and that absent a contrary agreement, money dividends follow the pledged stock.

Articles 8 and 9 of the Texas Business and Commerce Code control this inquiry.[4] Moreover, should any Code provision fail to cover any portion of the law of pledges, principles of pre-Code law are applicable. Tex.Bus. & Comm.Code Ann. § 1.103 (Vernon 1968). Sections 8.321 and 9.305 of the Texas and Business Commerce Code expressly authorize perfection of a security interest by the creditor's possession of the collateral. Clearly, the security interest in the stock was perfected by pledge when the Bank took possession of the stock certificates and accompanying documents. Tex. Bus. & Comm.Code Ann. § 8.321(a) (Vernon Supp.1989) ("a security interest in a security is enforceable and can attach only if it is transferred to the secured party ..."); see F.D.I.C. v. W. Hugh Meyer & Assoc., 864 F.2d 371 (5th Cir.1989).

Given that the security interest in the stock was properly perfected and that principles of pre-Code law apply in the absence of specific Code provisions, the disposition of the money dividends must be determined. Although post-Code treatment of the subject cannot be found, pre-Code case law was uniform in its treatment of money dividends paid from pledged stock. The Bank is correct in its assertion that money[5] dividends may be applied by the pledgee to the debtor's indebtedness, absent an agreement to the contrary. Am. Employers' Ins. Co. v. Dallas Joint Stock Land Bank, 170 S.W.2d 546, 550 (Tex.Civ. App.—Dallas 1943, writ ref'd w.o.m.); Fulton v. Nat'l Bank of Denison, 62 S.W. 84, 86 (Tex.Civ.App.1901, writ ref'd) ("pledgee of certificates of stock is entitled to hold them as against an administrator of the pledgor, and is entitled to receive and enforce dividends or other benefits attaching thereto, so long as his claim is unsatisfied").[6] Therefore, the Court finds that the money dividends may be applied by the Bank to the Debtor's indebtedness.

■ The fact that the pledge was not noted on the books of the corporation does not change the outcome. Strict requirement of registration upon the corporate books would be unfair to the pledgee. The pledgor could routinely set up lack of registration by the pledgee as a defense to a suit for the dividends. Moreover, even though the corporation may have notice of the pledge agreement, it may fail to make the transfer upon its records. As such, a court of equity should look beyond the requirement of registration when it becomes necessary to protect the pledgee's right to dividends. Comment, Right of Pledgees of Stock to Vote and Receive Dividends, 1 Sw.L.J. 238, 240 (1947).

■ The Debtor maintains that the Cash Collateral Order limited the status of the Bank as a lienholder under applicable bankruptcy law. This assertion is essentially correct, but the entitlement to dividends of pledged stock is a question of state law. Therefore, although the Debtor may be

---

**4.** Tex. Bus. & Comm.Code Ann. § 8.321(c) (Vernon Supp.1989) ("a security interest in a security is subject to the provisions of Chapter 9," with certain exceptions).

**5.** Under section 9.207(b)(3) stock dividends would be retained by the pledgee as part of the pledged property, but money dividends would either be given to the pledgor or applied to repayment of the loan. Lehr, Some Securities Law Issues in Lending on Pledged Stock, 38 Bus.Law. 91, 94 (1982).

**6.** Several other jurisdictions have recognized this rationale. See Sav. Union Bank & Trust Co. v. Crowley, 176 Cal. 543, 169 P. 67, 68 (1917); Whetsel v. Forgey, 323 Mo. 681, 20 S.W.2d 523, 528 (1929); In re Mackenzie's Estate, 35 Misc.2d 483, 230 N.Y.S.2d 63, 64–65 (Sur.Ct.1962).

correct in arguing that the Cash Collateral Order limited the Bank's lien status and rights to future income from collateral on a post-petition basis, it did *not* extinguish any portion of the pre-petition security interest held by the Bank. As a result, nothing in the orders of this Court or appropriate case law requires turnover by the Bank of the dividend.

### B. Cross-collateralization of the BNMHC stock.

The Debtor's second turnover cause of action relates to the disposition of 986 shares of Bank of New Mexico Holding Company ("BNMHC") stock which secured a promissory note purchased postpetition by the Bank from First National Bank of Amarillo, Texas (the "Amarillo Bank") in September, 1987. The parties agree that the Bank purchased from the Amarillo Bank a promissory note executed by Jess Burner and payable to the Amarillo Bank in the principal amount of $5,000.00, which was secured by 986 shares of BNMHC stock. The Debtor argues that the stock was property of the estate subject only to the Amarillo Bank lien because the shares were not included as security in the post-petition loan agreement. The Debtor claims that the proceeds of the sale by the Bank of the BNMHC stock for $88,740.00 should first be applied to the $5,400.66 principal and interest on the Amarillo Bank note, with the remaining proceeds to be turned over to the Debtor for distribution pursuant to the Plan. The Bank responds that upon its acquisition of the Amarillo Bank note and lien, the security for the $5,000.00 note became cross-collateralized

with the Bank's other security under the November, 1986 loan agreement and security agreement. Accordingly, the Bank claims that the net proceeds of the sale of the BNMHC stock serve to secure other indebtedness of the Debtor under the dragnet provisions.[7]

The BNMHC stock was clearly property of the estate on the date of the filing of this case, subject only to the lien of the Amarillo Bank. Upon the transfer of that lien to the Bank, the Bank succeeded to the rights of the Amarillo Bank, but did not acquire greater rights than those previously held. Because the stock was worth approximately $88,740.00 at the time of the transfer of the lien to the Bank and the debt was approximately $5,400.66, the bankruptcy estate had a net equity in the property of $83,339.34 which could not be transferred or hypothecated by the Debtor without permission of this Court. The fact that the Bank's original security agreement executed by the Debtor contained dragnet provisions which might, under ordinary circumstances, secure all indebtedness of Jess Burner to the Bank with all collateral of Jess Burner held by the Bank, did not allow the Bank to improve its position after the filing of this Chapter 11 case. No pre-confirmation sale of the BNMHC stock was authorized by this Court under section 363 of the Bankruptcy Code; no pre-confirmation credit secured by a lien on the BNMHC stock was authorized by this Court under section 364 of the Bankruptcy Code; and no pre-confirmation transfer of the BNMHC stock was authorized by this Court pursuant to section 549(a)(2) of the

---

7. It is undisputed that the Bank had no pre-petition lien on the BNMHC stock. Although the post-petition renewal note was drafted to provide the Bank with additional security in the form of the BNMHC and SSB stock, those security provisions were stricken at the time of execution of the post-petition renewal.

During negotiations prior to confirmation of the Plan, the Bank again claimed a security interest in the BNMHC stock to secure all debt owing to the Bank. Consequently, the Debtor's attorneys acquiesced, amending the Disclosure Statement to include the BNMHC stock as security for the Bank's class 12 claim, relying on the Bank's representation *that it had a valid, documented lien on the BNMHC stock.* The

Bank's oral representation of its BNMHC stock lien was apparently made on the basis of the Bank's belief that the Debtor had an obligation to grant the Bank a lien on the BNMHC stock (something the Debtor was not bound to do under the Cash Collateral Order), or based on the Bank's belief that the BNMHC stock had become cross-collateralized with the Bank's other security. The Plan was *not* modified to include the provision in the amended disclosure statement regarding the BNMHC stock, nor did it purport to grant a lien on the BNMHC stock to the Bank. The only lien held on such stock, therefore, was the Amarillo Bank lien purchased by the Bank.

Bankruptcy Code. The Bank, therefore, succeeded only to the lien rights of its predecessor, and was unable to improve its lien position with respect to its other secured indebtedness. Consequently, the Bank is entitled to retain the principal and interest due and owing on the promissory note in the amount of $5,400.66 as of the date of the Bank's purchase of the note. The net proceeds of the sale in the amount of $83,339.34 must be turned over to the Debtor as property of the estate. Additional interest until the date of the sale and fees allowable under the terms of the note and security agreement may be sought by the Bank upon proper application to this Court pursuant to section 506(b) of the Code.

### C. *Security State Bank stock.*

In the third cause of action for turnover, the Debtor argues that the $78,360.00 proceeds of the sale of the 1,306 shares of SSB stock are property of the estate. Although the SSB stock was originally included in the collateral listed in the post-petition financing agreement, it was deleted and initialed by the parties.[8] The Bank responds that the 1,306 shares of Security State Bank were set aside under the Plan for the purpose of partially satisfying the indebtedness to the Bank and acted as an inducement to the Bank to vote in favor of the Plan.

The Bank claims a lien on the 1,306 shares of SSB stock by virtue of a provision in the Plan.[9] The parties agree that there was no existing documentation evidencing a security interest in the SSB stock. As such, the Bank's claim to a lien on the SSB stock is solely by virtue of the Plan's statement that the SSB stock was listed in the Schedules as security for the Bank's claim.

Liens may be created by a plan of reorganization in an effort to gain a claimant's acquiescence to the plan. *See In re Placid Oil Co.,* 92 B.R. 183, 188 (Bankr.N.D.Tex.1988). Moreover, a confirmed plan of reorganization has binding effect on both debtors and claimants under the plan. *Republic Supply Co. v. Shoaf, supra; In re Auto Dealers Services, Inc.,* 89 B.R. 233 (Bankr.M.D.Fla.1988); *In re Blanton Smith Corp.,* 81 B.R. 440 (M.D. Tenn.1987). Further, a confirmed plan of reorganization has the effect of a judgment issued by district court. *In re French Gardens, Ltd.,* 58 B.R. 959 (Bankr.S.D.Tex. 1986). The dispute, however, is whether the Plan created a lien on the SSB stock, or whether it merely acknowledged the Bank's claim to a lien without admitting the validity of that claim.

The testimony in this case was uncontroverted that the Bank did not have a perfected security interest in the SSB stock prior to the filing of this Chapter 11 case. It was clear that the Bank wished to obtain a lien on the SSB stock because such stock was originally included in the post-petition financing agreement. Through negotiations, however, the SSB stock was deleted from the post-petition financing agreement. At a later meeting between counsel for the Bank and the Debtor prior to confirmation of the Plan, the Bank again asserted its position of entitlement to a lien on the SSB stock. At that point, the Debtor's attorney accepted at face value the Bank's statement that it had a lien on the SSB stock. It is undisputed that the Bank did not have a lien on the SSB stock at that time. The Debtor's attorney, however, amended the Plan, Disclosure Statement and Schedules to include the statement that the Bank was "listed in the Schedules as being entitled to a lien on all Security State Bank stock held

---

8. The Cash Collateral Agreement did not include such stock as collateral. *See* Finding of Fact number 5 & note 7, *supra.*

9. The Plan provides, in pertinent part:
Class 12 shall consist of all claims of Security State Bank of Pecos, Texas. The Class 12 Creditor has not filed a claim; was listed in the Schedules as being entitled to a claim in the amount of $1,540,726.02; and as being

entitled to ... a lien on all Security State Bank stock held by the Debtor.

\* \* \* \* \* \*

Debtor proposes discontinuation of the payments provided under the post-petition collateral and loan agreement, and proposes abandonment to the Class 12 Creditor of all properties securing its claims....

by the Debtor." Based upon this language in the Plan, the Bank now claims that it has been *granted* a security interest in the SSB stock by the terms of the Plan. The Debtor argues, however, that she never intended to grant a new lien on property on which the Bank did not previously have a lien, but merely accepted at face value the representations of the Bank that the Bank already had a valid lien on the SSB stock.

While under the case law, a plan of reorganization can create a lien, it is the opinion of the Court that in light of the circumstances and language in the Plan, the Plan does not clearly and unequivocally create a new lien on the SSB stock where none existed before confirmation of the Plan. While this Court would not hesitate to enforce a security interest created by unequivocal language in a plan of reorganization, the mere reference to a lien listed in the Schedules and based upon the representations of the creditor (which turned out to be in error), does not clearly and unequivocally create a lien on the SSB stock. In addition, the Plan has numerous provisions which specifically preserve the Debtor's post-confirmation right to object to any claim; preserve any cause of action to which the Debtor may be entitled; and retain jurisdiction in the Bankruptcy Court postconfirmation to classify claims and determine any disputes regarding claims or liens on assets of the estate.[10] Because the Bank had no lien on the SSB stock, and the Plan did not create such a lien, the Debtor is entitled to turnover of the proceeds of the sale of the 1,306 shares of the SSB stock in the amount of $78,360.00.

## V.

### THE BANK AS AN INSIDER

The Debtor maintains that the Bank acted as an insider through Mr. Montgomery's conduct as bank officer and executor of Jess Burner's estate. As defined within section 101(30) of the Code,[11] their relationship does not fall within the statutory definition. As such, the Debtor relies on case law interpretation of section 101(30) to expand the definition of "insider" to include relationships such as those between Mr. Montgomery and Mrs. Burner. *See In re Missionary Baptist Found. of Am., Inc.,* 712 F.2d 206 (5th Cir.1983); *Huizar v. Bank of Robstown (In re Huizar ),* 71 B.R. 826, 831 (Bankr.W.D.Tex.1987) (definition of "insider" not limited to statutory definition and must be applied flexibly on a case by case basis).

Cases which have recently dealt with the concept and application of "insider" beyond its statutory roots have focused upon the amount of control exercised by the alleged "insider." Simply stated, the relationship between a bank and its borrower is that of creditor and debtor. Consequently, cases examining this relationship have routinely held that a bank's financial power over its borrower is insufficient, standing alone, to render the bank an insider. *Huizar* at 831. Moreover, the control element necessary to qualify a bank as an insider must be such that the debtor was the mere alter ego or instrumentality of the bank, in that the bank was exercising such control and influence over the debtor that their transactions were not at arm's length. As a result, there must be credible evidence presented to demonstrate that the bank held some form of unreasonable control over the debtor.

The Debtor argues that the unreasonable control exercised by the Bank is a combination of three factors: (1) the Bank officer's close personal relationship with the Burn-

---

**10.** Although the Plan defines and describes "Allowed Claims" and "Allowed Secured Claims," the Bank's claim is never so described in the Plan. In addition, sections 3.5, 8.1 and 9.1 of the Plan contain provisions preserving the Debtor's rights to object to claims and liens; preserving the Debtor's claims and causes of action under applicable law; and retaining jurisdiction in this Court to determine such matters.

**11.** Section 101(30) defines an "insider" to include:
 A) if the Debtor is an individual—
 (i) relative of the Debtor or of a general partner of the Debtor;
 (ii) partnership in which the Debtor is a general partner;
 (iii) general partner of the Debtor; or
 (iv) corporation of which the Debtor is a director, officer, or person in control.

ers; (2) the Bank's domination over Mrs. Burner as her principal lender; and (3) the improper use of authority exercised by Mr. Montgomery as co-executor of Jess Burner's estate. Evidence of Mr. Montgomery's misconduct relates to his sale of the BNMHC stock without court approval and wrongful possession and sale of the SSB stock.

 First, the fact that the Debtor and an officer of the Bank have a close personal relationship is an insufficient basis to constitute a finding of an insider. *Toledo Trust Co. v. Peoples Banking Co. (In re Hartley)*, 52 B.R. 679 (Bankr.N.D.Ohio 1985). Aside from this basis, there is nothing to suggest that the Bank acted as an insider.

 Second, it is difficult to assess the Bank's "dominance" over the Burners. Generally, the relationship between a debtor and a creditor is an arm's length transaction, even though the creditor may have exercised some measure of financial control over the debtor to protect its collateral. *Markowitz v. Heritage Bank, N.A. (In re Jefferson Mortgage Co.)*, 25 B.R. 963, 970 (Bankr.D.N.J.1982). Such control is incidental to the debtor-creditor relationship. *See also Hartley, supra* at 690; *In re Belco, Inc.*, 38 B.R. 525, 529 (Bankr.W.D. Okla.1984). Further, the mere fact that a bank president and a debtor have a close personal relationship does not require a finding of insider status where all of the documents were prepared and executed on the advice of counsel.

 Third, the Debtor contends that Mr. Montgomery violated his duty as executor of Jess Burner's estate by the unauthorized sale of the BNMHC stock and

wrongful retention and sale of the SSB stock. The Debtor offers no case law support for her assertions that the Bank is an insider other than the combination of bank officer and co-executor raises Mr. Montgomery to a higher degree of scrutiny with respect to his actions. As co-executor, Mr. Montgomery has the right to dispose of property other than real property without the consent of Mrs. Burner.[12] Further, the sale of the BNMHC stock was a valid foreclosure on the Amarillo Bank lien which was postconfirmation, and therefore, did not require court approval.[13] The possession and sale of the SSB stock was subject to bona fide dispute because the Bank in good faith believed that the Plan granted the Bank a lien on the SSB stock.

 Moreover, it appears that the proper forum in which the Debtor can challenge Mr. Montgomery's conduct with respect to Jess Burner's probate estate is the probate court rather than the bankruptcy court. If Mr. Montgomery has violated his duties as executor, the Texas Probate Code provides a mechanism for the removal of executors. *See* Texas Prob.Code Ann. §§ 222 & 240 (Vernon 1980).

## VI.

## EQUITABLE SUBORDINATION

The Debtor asserts that due to the inequitable conduct of Dudley Montgomery, the claim of the Bank should be subordinated to the claims of the remaining creditors of the estate pursuant to section 510 of the Bankruptcy Code.

 Three conditions must be satisfied in order to obtain equitable subordination:

---

12. Should there be more than one executor or administrator of the same estate at the same time, the acts of one of them as such executor or administrator shall be as valid as if all had acted jointly; and, in case of the death, resignation or removal of an executor or administrator, if there be a co-executor or co-administrator of such estate, he shall proceed with the administration as if no such death, resignation or removal had occurred. Provided, however, that this Section shall not be construed to authorize one of several executors or administrators to convey real estate, but in such case all the executors or administrators who have qualified as such and are acting as such shall join in the conveyance, unless the court, after due hearing, authorizes less than all to act.
Tex. Prob.Code Ann. § 240 (Vernon 1980).

13. The BNMHC stock was abandoned at confirmation to the lienholder. This does not relieve the Bank, however, from the obligation to return the net sale proceeds to the Debtor after satisfaction of the secured debt.

(a) The claimant must have engaged in some type of inequitable conduct;

(b) The misconduct must have resulted in injury to the creditors of the debtor or conferred an unfair advantage on the claimant; and

(c) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.

*In re Missionary Baptist Found. of Am., Inc.*, 712 F.2d 206, 212 (5th Cir.1983); *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir.1977). All three must be proven for a claim to be subordinated.

■■■ In determining whether the Bank engaged in misconduct, it must first be determined whether the Bank was an "insider" or if it should otherwise be held to a fiduciary's duty of fair dealing as a noninsider. *Sleepy Valley, Inc. v. Leisure Valley, Inc. (In re Sleepy Valley, Inc.)*, 93 B.R. 925, 932–933 (Bankr.W.D.Tex.1988). As noted, the Debtor failed to prove that the Bank was an insider.

■■■ The primary distinction between subordinating the claims of insiders versus noninsiders lies in the severity of misconduct required to be shown. *Pinetree Partners, Ltd. v. OTR (In re Pinetree Partners, Ltd.)*, 87 B.R. 481, 488 (Bankr.N.D.Ohio 1988); *Anaconda–Ericsson, Inc. v. Hessen (In re Teltronics Services, Inc.)*, 29 B.R. 139, 169 (Bankr.E.D.N.Y.1983). Where the party is a noninsider, inequitable conduct must be proven with particularity. The degree of misconduct which the plaintiff must show in the case of a noninsider has been variously described as gross misconduct tantamount to fraud, misrepresentation, overreaching or spoliation. *In re Osborne*, 42 B.R. 988, 996 (W.D.Wis. 1984); *Pinetree Partners* at 488. Where the claimant is an insider, the claimant's dealings with the debtor will be subjected to more exacting scrutiny. The evidence adduced at trial is insufficient to establish inequitable conduct under the first prong of the *Mobile* test.

■■■ The Debtor further argues that Dudley Montgomery breached his fiduciary duty to the Debtor. Under normal circumstances, the relationship between a debtor and a creditor is an arm's length transaction. *Jefferson Mortgage*, 25 B.R. at 970. Furthermore, *Teltronics* held that a creditor is not a fiduciary of either the debtor or other creditors of the debtor. *Teltronics* at 169. A non-insider creditor will be held to a fiduciary standard only where his ability to control the debtor is so overwhelming that there has been a merger of identities. *Sleepy Valley*, 93 B.R. at 933. Unless the creditor has become the "alter ego" of the debtor, he will not be held to a fiduciary's duty of fair dealing. The Debtor failed to establish "overwhelming control" on the part of Dudley Montgomery necessary to apply a fiduciary standard of fair dealing.

In conclusion, the proof offered by the Debtor fails to establish inequitable conduct which satisfies the test stated in *Mobile*. Additionally, the Debtor failed to establish sufficient control necessary to hold the Bank, as a noninsider, to a fiduciary standard. Thus, because the Debtor failed to establish the requisite conduct on the part of the Bank, the equitable subordination claim fails.

## VII.

### INSIDER PREFERENCE

■■■ The Debtor argues that the pledges of stock and deed of trust granted on Jess Burner's Presidio real property should be avoided as an insider preference pursuant to section 547(b)(4)(B) of the Bankruptcy Code.[14] Having found that the Bank is not an insider, there obviously can be no insider preference. Further, the rebuttable presumption of insolvency under section 547(f) does not apply to the period between ninety days and one year prior to filing. Consequently, "a debtor-in-posses-

---

**14.** Section 547(b) provides, in relevant part:
(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
* * * * * *

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; ...

sion or trustee must affirmatively introduce evidence of insolvency to recover a preferential transfer that occurred prior to the ninety day period." M. Bienenstock, *Bankruptcy Reorganization* at 383 (Practicing Law Inst.1987); *see also Huizar,* 71 B.R. at 832. The Debtor adduced no evidence to support a finding of insolvency during the ninety day to one year period prior to the filing of bankruptcy. As such, the pledges of stock and deed of trust on the Presidio property are not avoidable insider preferences.

## VIII.

## CONCLUSION

For the reasons stated in this Opinion, the Court makes the following holdings:

1. This Court has jurisdiction over the probate estate of Jess Burner;
2. The Debtor's request for turnover of the $105,832.57 cash dividend from the Champion Feeders, Inc. stock should be denied;
3. The $83,339.34 net proceeds of the sale of the BNMHC stock should be turned over to the Debtor by the Bank and distributed pursuant to the Plan, but without prejudice to the right of the Bank to file an application in the bankruptcy case under section 506(b) of the Code for allowance of interest and fees;
4. The Debtor's request for turnover of the $78,360.00 proceeds from the SSB stock should be granted because the Bank did not have a lien on such stock;
5. The Bank is not an insider of the Debtor;
6. The claims of the Bank should not be subordinated pursuant to section 510(c); and
7. The deed of trust on the Presidio real property and pledges of stock under the November, 1986 financing are not avoidable as insider preferences.

Pursuant to Bankruptcy Rule 7052, this Opinion shall constitute the findings of fact and conclusions of law of the Court. A judgment will be rendered contemporaneously herewith.